**RIVERWOODS CHAPPAQUA CORP. and Harvey Shapiro, Plaintiffs–Appellants,**

v.

**MARINE MIDLAND BANK, N.A., Defendant–Appellee.**

**No. 949, Docket 93–7732.**

United States Court of Appeals, Second Circuit.

Argued Feb. 9, 1994.

Decided July 20, 1994.

Brian Koukoutchos, Cambridge, MA (Matthew S. Dontzin, New York City, of counsel), for plaintiffs-appellants.

James M. Altman, New York City (Suzanne M. Berger and Cheryl R. Oler, Robinson Silverman Pearce Aronsohn & Berman, of counsel), for defendant-appellee.

Before: TIMBERS, MINER and McLAUGHLIN, Circuit Judges.

MINER, Circuit Judge:

Plaintiffs-appellants Riverwoods Chappaqua Corporation ("RCC") and Harvey Shapiro appeal from a judgment, entered on June 23, 1993 in the United States District Court for the Southern District of New York (Brieant, J.) after a jury trial, dismissing their amended complaint in an action to recover damages pursuant to the civil enforcement provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. The factual basis for the complaint was appellants' allegation that, through acts of extortion and mail fraud, defendant-appellee Marine Midland Bank coerced appellants to "restructure" certain loan agreements made between RCC and Westchester Federal Savings Bank ("WFSB"). Marine Midland inherited the agreements when it acquired WFSB in 1986.

In the amended complaint, several alternative theories were offered as to how Marine Midland violated the RICO statute. In Count I of the amended complaint, it was alleged that, through a pattern of racketeering activity, Marine Midland and two of its loan officers, Augustus Costaldo and Thomas Brennan, participated in the affairs of an association-in-fact enterprise known as the "Restructuring Group," in violation of 18 U.S.C. § 1962(c). In Count II, it was alleged that RCC was an enterprise within the meaning of the RICO statute, 18 U.S.C. § 1961(4), and that through a pattern of racketeering activity Marine Midland, Costaldo and Brennan acquired an interest in or control of RCC, in violation of 18 U.S.C. § 1962(b). In Count III, it again was alleged that RCC was the enterprise, and in this count Marine Midland and its loan officers were said to have conducted or participated in the conduct of RCC through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). In Count IV, it was alleged that Marine Midland, Costaldo and Brennan conspired to violate RICO, in violation of 18 U.S.C. § 1962(d). The district court directed a verdict in favor of Marine Midland on Counts I and IV, and the jury returned a verdict in favor of Marine Midland on Counts II and III. On appeal, appellants contend that the district court erred by directing a verdict on Count I. On Counts I, II and III, they challenge the district court's decision not to admit the testimony of other WFSB borrowers whose loans were restructured by Marine Midland. As to Counts II and III, they assign as error certain jury instructions given by the district court. Appellants do not challenge the dismissal of Count IV. For the following reasons, we affirm.

**BACKGROUND**

In June of 1983, RCC's predecessor and Shapiro, a real estate developer, purchased property in New Castle, New York known as Riverwoods for the purpose of developing residential condominiums. In November of 1985, WFSB made a loan commitment to Shapiro and RCC's predecessor for the development of Riverwoods. WFSB was to provide $4.5 million of initial financing, additional construction loans to underwrite the

completion of the first phase of construction and financing for additional phases of construction through a cash collateral account. RCC's predecessor was permitted to obtain unlimited secondary financing and was to receive approximately 15% of the sale proceeds of each condominium unit sold. WFSB's commitment fees were not to exceed $300,000 and were to be paid over the life of the loan. According to Shapiro, the loans would not be due for five years.

In September of 1986, Marine Midland acquired WFSB and inherited the agreements with RCC for the Riverwoods project. At that time, WFSB already had advanced approximately half of the $4.5 million of initial financing, and Marine Midland became obligated to advance the balance and provide up to $9–10 million more for the completion of the project's first phase. In November, Shapiro had a "get-acquainted" meeting with employees of Marine Midland, including vice president Costaldo. According to appellants, the Marine Midland officers made it clear that they intended to dishonor the existing agreements, and their conduct indicated that they intended to coerce Shapiro and RCC to abandon the WFSB agreement and accept a new agreement with terms more advantageous to Marine Midland.

Appellants allege that, in the months following the November meeting, Marine Midland withheld disbursements due under the WFSB agreements in order to exact new obligations. During the period between December of 1986 and January of 1987, by threatening to withhold funds, Marine Midland purportedly "extorted" four short-term promissory notes from Shapiro, secured by the Riverwoods property, totalling over $2 million. According to appellants, Marine Midland used the notes to force them to enter into a new loan agreement. They contend that if they had not agreed to new terms, the notes would have come due or would have been called in and the project would have collapsed. Marine Midland denies that it intended to dishonor the WFSB loan, and points out that it made requisition payments to RCC for expenses incurred from November of 1990 through March of 1991, and that Costaldo obtained approval for an additional loan of $10.5 million for the first phase of the development.

Whatever their motivations may have been, the parties began negotiating a restructured loan agreement in December of 1986. A commitment letter was signed in February of 1987, and the new loan agreement closed in March. It was disputed at the trial whether RCC was better off with the restructured loan or the original WFSB loan. Appellants argue that the restructured loan was highly disadvantageous because it imposed a $17 million cap on the availability of construction funds, imposed unrealistic minimum sale prices for units, shortened the maturity date of the loan by a year, imposed a prohibition against secondary financing over $500,000, reduced RCC's percentage of the sale proceeds to 10% until a certain part of the loan was repaid and required higher commitment fees. Marine Midland counters that the restructured loan provided many advantages to RCC because it allowed RCC to make more overall profit, made more funds available at any one time, did away with the "risky" cash collateral mechanism and generally allowed RCC more flexibility. According to RCC, no reasonable borrower would have relinquished the WFSB loan for the restructured loan. However, Marine Midland presented two expert witnesses who testified that they would have preferred the restructured loan over the WFSB loan.

In July of 1987, Marine Midland obtained a $500,000 personal guaranty from Shapiro. Shapiro complains that this guaranty was further illustration of Marine Midland's coercive lending practices. In November of 1988 and February of 1989, the restructured loan again was modified to increase the total amount available to RCC, but, on each occasion, a personal guaranty matching the cap increase was exacted from Shapiro. In November of 1989, Marine Midland gave RCC notice that it was in default and, in March of 1990, Marine Midland commenced a foreclosure action in New York Supreme Court, Westchester County. While the appeal at bar was under consideration, the state court action was decided in favor of Marine Midland. *Marine Midland Bank v. Riverwoods*

*Chappaqua Corp.,* No. 4716/90 (N.Y.Sup.Ct.Westchester Cty., May 25, 1994).

Appellants commenced the action giving rise to this appeal against Marine Midland and three Marine Midland vice presidents, Costaldo, Brennan and Robin M. Gallagher on October 22, 1991. Appellants later discontinued the action against the individual defendants, leaving Marine Midland as the sole defendant in the case.

During the presentation of their case, appellants planned to call as witnesses three other developers who had borrowed from WFSB ("Other Borrowers"). Employing tactics similar to those it used against appellants, Marine Midland allegedly coerced these witnesses to restructure their loans. The use of these witnesses' testimony was discussed at a pre-trial motion *in limine.* At trial, the district court disallowed the testimony, reasoning that it was inadmissible on Count I, which included the allegation that Marine Midland participated in the affairs of the Restructuring Group, since appellants had abandoned that claim in their opening statement and that, as to the "main case" (Counts II and III), the testimony constituted similar act evidence and would be admitted only if Marine Midland "opened the door" by putting its knowledge or intent in issue.

After appellants rested, Marine Midland moved for a directed verdict on all four counts. The district court granted the motion as to Count I and Count IV. As stated above, the jury found for Marine Midland on the other counts, and judgment was entered dismissing the complaint. This appeal followed.

## DISCUSSION

### 1. *Directed Verdicts*

■ Appellants first contend that the district court erred in directing a verdict on Count I in favor of Marine Midland. As noted previously, they do not contest the dismissal of Count IV. In dismissing Count I, the district court concluded that (1) appellants abandoned this claim in their opening argument by addressing only the Count II theory that the RICO enterprise was RCC;

(2) the claim was inconsistent with the other claims for relief; and (3) the evidence was insufficient to show a common scheme or plan with regard to all of the WFSB loans. We agree with appellants that the reasons stated by the district court did not justify dismissal of Count I. First, a claim may be dismissed on the basis of an opening statement only if the statement clearly demonstrates that the plaintiff has no cause of action. *See Best v. District of Columbia,* 291 U.S. 411, 415–16, 54 S.Ct. 487, 489, 78 L.Ed. 882 (1934). There were no admissions in appellants' opening statement that would completely preclude recovery under Count I. Second, it is not clear to us that Count I was factually inconsistent with the other counts, and a party may properly submit a case on alternative theories. *See Marcella v. ARP Films, Inc.,* 778 F.2d 112, 117 (2d Cir.1985). Finally, the lack of sufficient evidence to prove a common scheme or plan to restructure the WFSB loans was largely a consequence of the district court's exclusion of the testimony of the Other Borrowers.

■ Although we are dissatisfied with the reasons stated by the district court for dismissing Count I, we agree with Marine Midland that the evidence does not establish that the alleged RICO enterprise, the Restructuring Group, was distinct from the defendant, Marine Midland, as required by 18 U.S.C. § 1962(c). We affirm the dismissal of Count I on this basis. *See Leon v. Murphy,* 988 F.2d 303, 308 (2d Cir.1993) (court of appeals may affirm "on any basis for which there is a record sufficient to permit conclusions of law, including grounds upon which the district court did not rely").

It is alleged in Count I that Marine Midland violated section 1962(c) by participating in the conduct of the affairs of the Restructuring Group through a pattern of racketeering activity. Section 1962(c) provides as follows:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's af-

fairs through a pattern of racketeering activity or collection of unlawful debt.

Under this section, the RICO "person" must conduct the affairs of the RICO "enterprise" through a pattern of racketeering activity. We have determined that the person and the enterprise referred to must be distinct. *See, e.g., Official Publications, Inc. v. Kable News Co.,* 884 F.2d 664, 668 (2d Cir.1989); *Bennett v. U.S. Trust Co.,* 770 F.2d 308, 315 (2d Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986). As we recognized in *Bennett,* the plain language of section 1962(c) clearly envisions separate entities, and the distinctness requirement comports with legislative intent and policy. 770 F.2d at 315. This requirement "focuses the section on the culpable party and recognizes that the enterprise itself is often a passive instrument or victim of the racketeering activity." *Id.*

We have made clear that, by virtue of the distinctness requirement, a corporate entity may not be both the RICO person and the RICO enterprise under section 1962(c). *Id.* This does not foreclose the possibility of a corporate entity being held liable as a defendant under section 1962(c) where it associates with others to form an enterprise that is sufficiently distinct from itself. In this regard we have noted that a section 1962(c) claim may be sustained where there is only a partial overlap between the RICO person and the RICO enterprise, *Jacobson v. Cooper,* 882 F.2d 717, 720 (2d Cir.1989), and that a defendant may be a "RICO 'person' and one of a number of members of the RICO 'enterprise,'" *Cullen v. Margiotta,* 811 F.2d 698, 730 (2d Cir.), *cert. denied,* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987). Nevertheless, by alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant, the distinctness requirement may not be circumvented. *See Brittingham v. Mobil Corp.,* 943 F.2d 297, 301 (3d Cir.1991); *accord Board of County Comm'rs v. Liberty Group,* 965 F.2d 879, 885 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 329, 121 L.Ed.2d 247 (1992); *Odishelidze v. Aetna Life & Casualty Co.,* 853 F.2d 21, 23–24 (1st Cir.1988) (per curiam); *Entre Computer*

*Ctrs., Inc. v. FMG, Inc.,* 819 F.2d 1279, 1287 (4th Cir.1987); *Official Publications, Inc. v. Kable News Co.,* 775 F.Supp. 631, 636 (S.D.N.Y.1991). *But see Richardson Greenshields Sec., Inc. v. Mui–Hin Lau,* 693 F.Supp. 1445, 1448–49 (S.D.N.Y.1988); *Salzmann v. Prudential Sec., Inc.,* No. 91 Civ. 4253, 1994 WL 191855 (S.D.N.Y. May 16, 1994).

■ Because a corporation can only function through its employees and agents, any act of the corporation can be viewed as an act of such an enterprise, and the enterprise is in reality no more than the defendant itself. *See Brittingham,* 943 F.2d at 301. Thus, where employees of a corporation associate together to commit a pattern of predicate acts in the course of their employment and on behalf of the corporation, the employees in association with the corporation do not form an enterprise distinct from the corporation. *See Old Time Enters. v. International Coffee Corp.,* 862 F.2d 1213, 1217 (5th Cir. 1989).

Factually, this case is similar to *Atkinson v. Anadarko Bank & Trust Co.,* 808 F.2d 438, 440–41 (5th Cir.) (per curiam), *cert. denied,* 483 U.S. 1032, 107 S.Ct. 3276, 97 L.Ed.2d 780 (1987). There, the plaintiffs had alleged that the defendant, a bank, its holding company and three employees conspired to defraud plaintiffs in connection with a loan agreement. *Id.* at 440. The alleged enterprise was an association-in-fact of the bank, its holding company and its employees. The alleged predicate acts were acts of mail fraud, committed when loan statements were sent to the plaintiffs. *Id.* The court concluded that there was no evidence that the bank, its holding company and its employees "were associated in any manner apart from the activities of the bank." *Id.* at 441. In particular, the mailing of the loan statement clearly was an activity of the bank. *Id.*

Similarly, in this case, appellants cannot seriously contend that the actions of the Restructuring Group were anything other than activities of Marine Midland employees carrying out the business of that bank. Both the allegations in the complaint and the proof at trial showed that the individual members

of the Restructuring Group were employed by Marine Midland at the relevant times. These employees were acting within the scope of their authority as officers of Marine Midland, and all of the actions taken by the Restructuring Group, such as negotiating and executing the restructured loan and exacting personal guarantees from Shapiro, were undertaken on behalf of Marine Midland and were directly related to the bank's business. Indeed, even on appeal, appellants continue to refer to the Count I enterprise as Marine Midland, rather than as an association-in-fact separate and apart from Marine Midland. For instance, in their appellate brief they state that "the *Bank* established a plan to restructure the loans," *Appellants' Br.* at 19 (emphasis added), and that "the racketeering activity alleged was a 'regular way of conducting' *Marine Bank*'s business," *id.* at 36 (emphasis added). Appellants assert that the district court improperly precluded them from introducing evidence concerning the nature of the enterprise alleged in Count I, including the testimony of the Other Borrowers and of members of the Restructuring Group. However, appellants do not explain even in the most general terms how this testimony would establish that the Restructuring Group was distinct from Marine Midland. That being the case, we disagree with appellants that a remand is required on this issue.

Relying on *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639*, 883 F.2d 132, 140 (D.C.Cir.1989), *modified on other grounds*, 913 F.2d 948 (D.C.Cir.1990) (en banc), *cert. denied*, 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991), appellants argue that the distinctness requirement should not apply where the corporate defendant is itself a culpable party rather than a passive victim of the racketeering activity. We disagree. In *Yellow Bus Lines*, the court merely recognized that corrupt organizations may be subject to direct liability under section 1962(a), which prohibits a "person" who has received racketeering proceeds from investing the proceeds in an "enterprise." *Id.* As we noted in *Kable News*, there is no requirement under section 1962(a) (as opposed to section 1962(c)) that the "per-

son" be distinct from the "enterprise." 884 F.2d at 668.

### 2. Testimony of Other Borrowers

Appellants contend that the district court erred in precluding the testimony of the Other Borrowers. Aside from its relevance to Count I, which we have held properly was dismissed, appellants argue that the proposed testimony regarding other acts of coercion by Marine Midland was relevant to show wrongful intent. The district court refused to admit the testimony "on the main case" and stated that it would admit the testimony only if Marine Midland "opened the door" by putting its knowledge or intent in issue.

■ Under Rule 404(b) of the Federal Rules of Evidence, evidence of other crimes, wrongs or acts is not admissible merely to prove that a person had a propensity to commit the act at issue. *See Berkovich v. Hicks*, 922 F.2d 1018, 1022 (2d Cir.1991). Such evidence may be admissible under the rule for other relevant purposes, however. Under our "inclusionary" approach to admitting evidence under Rule 404(b), *id.*, the testimony of the Other Borrowers arguably was relevant to show Marine Midland's intent to coerce appellants to restructure the WFSB loan.

Moreover, it was clear from the outset of the trial that Marine Midland's wrongful intent would be in issue. The predicate acts alleged in the complaint included mail fraud and extortion, and in its answer to the complaint and in its opening statement Marine Midland denied that it intended to extort appellants. Accordingly, the district court's ruling that Marine Midland had to open the door by putting its intent at issue before the testimony would be admitted was incorrect— the door already was open. *See United States v. Caputo*, 808 F.2d 963, 968 (2d Cir. 1987) (evidence of prior similar bad acts admissible on case-in-chief when it is apparent that intent will be in dispute).

■ Nevertheless, we conclude that appellants abandoned their objection to the exclusion of the testimony by failing to re-offer it to the district court after it was conditionally excluded. The admissibility of the testimony

first was raised in a pre-trial motion *in limine*. The district court never ruled on the motion. During appellants' direct case, however, the district court stated that the testimony could not be "admitted on the direct case and would be admissible only on the issue of knowledge and intent, and would come in on a rebuttal case if the defendant opens the door." When, over objection, appellants in their direct case sought to elicit testimony concerning the other WFSB loans that were restructured, the district court stated, "I'll sustain the objection at the present state of the record with leave to represent [sic] it during the course of cross examination." By these statements, the district court clearly invited appellants to re-offer the excluded evidence and indicated that it would reconsider its prior rulings. Appellants did not offer the evidence again and have given no satisfactory explanation for failing to do so. On rebuttal, appellants easily could have pointed out to the district court where in the record Marine Midland had put its intent at issue. Although the district court held the incorrect belief that similar bad act evidence is admissible only on rebuttal, any error associated with this belief easily could have been avoided. Having passed up the opportunity to clarify the matter to the district court, appellants cannot claim reversible error on appeal. *See Healey v. Chelsea Resources, Ltd.*, 947 F.2d 611, 621 (2d Cir.1991).

### 3. Jury Instructions

Appellants also assign as error the district court's refusal to provide a more specific definition of the words "interest" and "control" as used in section 1962(b) and its refusal to give an equitable tolling instruction based on duress.

#### A. Control and Interest Under Section 1962(b)

The district court gave the following charge regarding the "control" and "interest" element of the section 1962(b) violation alleged in Count II: "[Y]ou must agree ... that the defendant not only had some interest in or control over the Riverwoods enterprise, but also that this interest or control was associated with, or connected to, or ac-

quired by, or maintained by a pattern of racketeering activity." Appellants do not contend that this was an incorrect statement of the law. Rather, they suggest that the district court erred by failing to give the jury the remainder of a proposed instruction that further defined "control" and "interest" as follows:

The "control" over the RCC enterprise need not be formal and does not require the type of control one gains by owning enough stock to elect a majority of the board of directors of a corporation. Similarly, an "interest" in the RCC enterprise need not be in the nature of a partnership or majority stock ownership. An "interest" includes any right, claim, title or legal share in something.

■■■ Even if the proposed instruction were correct, *see United States v. Jacobson*, 691 F.2d 110, 112–13 (2d Cir.1982) (per curiam), reversal would not be warranted. The district court is not obligated to charge the jury using the exact words proposed by a party, *see Brooks v. Cook*, 938 F.2d 1048, 1053 (9th Cir.1991), and it has considerable latitude in deciding what language to use in conveying the applicable law to the jury, *Ad–Vantage Tel. Directory Consultants v. GTE Directories Corp.*, 849 F.2d 1336, 1349 (11th Cir.1987). Moreover, a judgment will not be reversed on appeal unless the instructions given, on the whole, gave the jury a misleading or inadequate impression of the law. *See BAII Banking Corp. v. UPG, Inc.*, 985 F.2d 685, 696 (2d Cir.1993). In this case, the words "control" and "interest" are common enough to be understood without reference to the appellants' proposed instruction. *See Federal Enters. v. Greyhound Leasing & Fin. Corp.*, 849 F.2d 1059, 1063 (8th Cir.1988) (failure to define "actual authority" not prejudicial because ordinary understanding of term did not prejudice party). While a more specific instruction might have been helpful, there is no basis for concluding that the jury was given a misleading or inaccurate impression of the law.

#### B. Equitable Tolling

The district court instructed the jury that appellants could not recover on their RICO

claims for any damages incurred prior to October 22, 1987. Appellants proposed the following instruction on equitable tolling, which was rejected by the district court:

> However, even if you find that a portion of plaintiffs['] damages did come into existence and were discovered, or reasonably should have been discovered prior to 10/22/87, you may still award plaintiffs such damages if you find that plaintiffs held off from filing a lawsuit to recover those damages as a result of threats by defendant of economic injury.

As a threshold matter, we must decide whether equitable tolling based on duress is proper in a civil RICO case and what law should govern. In *Cullen v. Margiotta,* 811 F.2d 698, 717 (2d Cir.), *cert. denied,* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987), we held that, since the RICO statute did not include its own statute of limitations, we would look to state law to determine the appropriate limitations period. We further held that New York's principles of equitable tolling, including tolling based on duress, applied in that case, observing that "when a federal court looks to state law to determine the most appropriate statute of limitations, it must also, so long as federal policy is not thereby offended, apply the state's rules as to the tolling of the statute." *Id.* at 719.

In *Agency Holding Corp. v. Malley–Duff & Assocs., Inc.,* 483 U.S. 143, 156, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987), overruling one of our holdings in *Cullen,* the Court concluded that the civil enforcement provision of the Clayton Antitrust Act, 15 U.S.C. § 15, rather than state law, was the closest analogy to the civil enforcement provisions of RICO and that the four-year statute of limitations specified in that act, 15 U.S.C. § 15b, should be applied in civil RICO actions. While the Court did not address the question, it seems obvious to us that the concerns for uniformity articulated in *Agency Holding,* 483 U.S. at 149–50, 107 S.Ct. at 2763–64, dictate that federal rather than state tolling doctrines should govern in civil RICO actions. *See Davis v. Grusemeyer,* 996 F.2d 617, 624 & n. 12 (3d Cir.1993) (federal fraudulent concealment doctrine applies to civil RICO claims).

▮ Under the New York law relied upon by appellants, "duress tolls the running of a statute of limitations if duress against the plaintiff is an element of the cause of action asserted." *Cullen,* 811 F.2d at 722. "[T]he statute of limitations is tolled until the duress has ended 'because the offensive conduct is regarded as a continuous wrong.'" *Id.* (quoting *Baratta v. Kozlowski,* 94 A.D.2d 454, 464 N.Y.S.2d 803, 806 (1983)). Cases decided under the Clayton Act, from which the RICO statute of limitations was borrowed, have taken a much narrower view of the tolling-by-duress principle. The courts in these cases held that the duress inherent in an antitrust violation does not toll the statute of limitations, for a contrary rule "would preclude the application of any limitation to an ongoing antitrust violation in which plaintiffs could plausibly allege some aspect of coercion in the underlying scheme." *Donahue v. Pendleton Woolen Mills, Inc.,* 633 F.Supp. 1423, 1442 (S.D.N.Y.1986); *see Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1056–57 (5th Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983). We hold that a similar rule should apply in civil RICO actions, since, as with antitrust violations, duress and coercion almost always will be inherent in the RICO violation. Accordingly, an equitable tolling defense based on duress is available only when specific threats by the defendant are used to prevent the plaintiff from commencing a lawsuit at an earlier time. *See Donahue,* 633 F.Supp. at 1442; *Kaiser Aluminum,* 677 F.2d at 1056.

▮ Assuming that appellants' proposed instruction correctly states the federal rule for equitable tolling based on duress, no evidence was adduced to support the tolling and, accordingly, there was no basis for the instruction. *See Pierce v. F.R. Tripler & Co.,* 955 F.2d 820, 826 (2d Cir.1992) (party that presents no evidence on particular theory has no right to instruction on that theory). The basis for equitable tolling asserted by appellants is that Marine Midland threatened Shapiro that it would cut off loan funds if Shapiro refused to restructure the loans. This theory involves the same acts of coercion that formed the basis for the RICO

predicate acts and thus are inherent in the alleged RICO violation. Appellants can point to no evidence in the record that any of Marine Midland's threats of economic injury were directed at the filing of this lawsuit.

Finally, we note that even if a remand were otherwise appropriate appellants may be collaterally estopped from claiming duress in the loan transactions. In the state-court foreclosure action on the restructured loans, Shapiro and RCC raised duress as a defense. The court concluded that they "failed to show that the restructured loans were entered into by a wrongful threat which precluded the exercise of their free will." Accordingly, the theory put forth by appellants here—that Marine Midland would have cut off loan funds if Shapiro refused to restructure the WFSB loan—was expressly rejected. The duress issue having been decided against them in the state court action, appellants likely would be estopped from relitigating it in federal court. *See generally Staffer v. Bouchard Transp. Co.*, 878 F.2d 638, 644 (2d Cir.1989) (discussing collateral estoppel theory).

## CONCLUSION

In accordance with the foregoing, we affirm the judgment of the district court.