**Joseph WILLIAMS, on behalf of himself and others similarly situated, Plaintiff,**

v.

**FORD MOTOR COMPANY and Highland Park Ford, Inc., Defendants.**

No. 97 C 162.

United States District Court,
N.D. Illinois,
Eastern Division.

May 18, 1998.

Cathleen M. Combs, Daniel A. Edelman, James O. Latturner, Beth Ilyse Solomon, Edelman & Combs, Chicago, IL, for Plaintiff.

Alfred M. Swanson, Jr., Peter Francis Heraty, Jones, Ware & Grenard, Chicago, IL, Brian C. Anderson, Evelyn L. Becker, Jessica Davidson Miller, O'Melveny & Myers LLP, Washington, DC, for Defendant Ford Motor Co.

Stuart Berks, Michael Joseph Devine, Phillip Michael Schreiber, James Edward O'Halloran, III, Deutsch, Levy & Engel, Chicago, IL, for Defendant Highland Park Ford, Inc.

### MEMORANDUM AND ORDER

MORAN, Senior District Judge.

Plaintiff Joseph Williams (Williams), on behalf of a putative class of individuals similarly situated, brought this action against defendants Ford Motor Company (Ford) and Highland Park Ford, Inc. (Highland), claiming, *inter alia*, that Highland violated the Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. § 1962(c), when it fraudulently sold plaintiff an extended service plan (ESP) in connection with the purchase of a used car without disclosing the existence of an inspection fee. In our July 29, 1997 Memorandum and Order (July 29 order), this court dismissed plaintiff's RICO claim against Highland (Count I). On December 31, 1997, Williams filed a second amended complaint, which includes additional allegations and again claims to state a RICO cause of action against Highland. Highland, in turn, has moved to dismiss. For the reasons stated herein, Highland's motion to dismiss is granted.

### DISCUSSION

As the relevant facts have already been set forth in our previous order we will only briefly summarize them here. The dispute centers on plaintiff's June 17, 1994, purchase of a used Ford automobile from Highland, an authorized Ford dealer. In connection with this purchase plaintiff paid an additional $1,195 for an ESP that provided coverage for repairs incurred after the expiration of the Ford's basic limited warranty. The only mention of costs beyond the initial purchase price of the ESP was the requirement of a $50 deductible per repair visit. The ESP specifically stated that "All you pay is the deductible." Under the ESP, plaintiff was entitled to receive covered repairs at all participating Ford dealers in the United States and Canada.

Plaintiff's car lost power on July 24, 1996, and he took it to Highland for service. Highland informed him that Ford required the payment of an inspection fee of $612.95 before it would decide whether the problems were covered by the ESP. On July 31, 1996, plaintiff paid the inspection fee and Highland inspected the vehicle. Highland removed the engine and concluded that it was defective and would cost approximately $6,000 to repair. Ford determined that $6,000 was too expensive, in light of the value of Williams' vehicle, and elected instead to pay Williams the NADA value of $1,575. Ford had yet to pay Williams the $1,575.

Williams brings his claim against Highland under § 1962(c) of RICO, which provides as follows:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

18 U.S.C. § 1962(c). To state a claim under § 1962(c) a RICO plaintiff must show the "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).[1]

In his first amended complaint Williams alleged that Ford was a RICO "enterprise" (1st am.cplt.¶ 33). In his response to defendants' motion to dismiss Williams argued that Highland was the RICO "person" who participated in the operation and management of the RICO enterprise (pl.joint resp. at 5–6). Williams explicitly argued in that response that this was *not* a case where the RICO enterprise was an "association in fact," consisting of Ford and Highland (pl.joint resp. at 4–5). He asserted that Highland, as an outsider to the RICO enterprise, exercised control over Ford by selling Ford's ESPs, informing consumers of the inspection fee, collecting the inspection fee on behalf of Ford, and preforming the repairs covered by the plan.

We dismissed Williams' RICO claim, finding that he had not sufficiently stated that Highland had "participated in the operation or management" of Ford in a way that would satisfy the "conduct" prong of the RICO test. *See Reves v. Ernst & Young,* 507 U.S. 170, 185, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). Specifically, we stated that the "fact that Highland was associated with Ford as a sales representative for Ford automobiles and ESPs does not invest it with the requisite degree of control to establish RICO liability." (July 29 order at 9). Rejecting Williams'

claim that Highland's imposition of the inspection fee as a precondition of service under the ESP fulfilled the statutory requirements, we stated that "Highland's unilateral decision to charge plaintiff the fee does not constitute 'participation' in Ford's affairs" (July 29 order at 10).

Abandoning his original claim that Ford was the RICO enterprise and Highland the RICO person, Williams has now amended his complaint to allege that the relationship between Ford and Highland constituted an "association in fact" (2d am. cplt. at ¶ 34). Specifically, Williams adds the following factual allegations:

35. The association in fact of F[ord] and its affiliated dealers and/or servicers is an "enterprise" as defined in 18 U.S.C. § 1961(4), the affairs of which affect interstate commerce. F[ord] manufactures cars in several states and sells them in all 50.

36. The enterprises have a definite structure with common decision-makers and purpose. F[ord] issues the service plans, while the affiliates (including Highland) sell the plans while acting on behalf of F[ord].

37. Highland exploited the enterprises, including the reputation of F[ord] to:

a. make money by selling warranties that were of no practical value because of the extremely large inspection fee; and

b. unlawfully charge and/or collect inspection fees that, in Mr. Williams' case, equaled almost half of the NADA value of the car itself.

(2d am.cplt., ¶¶ 35–37). Once again Highland moves to dismiss, arguing, *inter alia,* that Williams has failed to sufficiently alleged a RICO enterprise.

■ A RICO complaint must identify the enterprise. *Jennings v. Emry,* 910 F.2d 1434, 1439–40 (7th Cir.1990). An "associa-

---

1. "Racketeering activity" is defined by the statute as "any act which is indictable under any of the following provisions of title 18, United States Code:... section 1341 (relating to mail fraud)...." 18 U.S.C. § 1961(1). Section 1341, in turn, makes it unlawful for any person to use

the mails for the purpose of executing a "scheme or artifice to defraud." 18 U.S.C. § 1341. Here, we accept for the purposes of this motion that plaintiff has adequately alleged that defendant used the mails to engage in a scheme to defraud purchasers of Ford's ESPs.

tion in fact" enterprise is defined by the statute as a "union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court has described it as "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). The Court explained that an enterprise is shown "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.*

■ Williams alleges two separate enterprises. One is the "association in fact" comprised of Ford and its affiliated dealers and/or servicers. This alleged enterprise does not meet the requirements concerning structure, continuity, and common course of conduct that would be sufficient to establish an association in fact. *See Richmond v. Nationwide Cassel L.P.,* 52 F.3d 640, 645 (7th Cir.1995). Specifically, the complaint lists only Highland and Ford as components of the RICO enterprise, although it alludes to an unspecified number of other "affiliated dealers and/or servicers" as constituent parts of the association in fact. The complaint alleges in conclusory fashion that this enterprise has a "definite structure with common decision-makers" but in no way identifies specific facts demonstrating the relationship between Ford and any other dealer or affiliate besides Highland. This type of complaint, which omits any substantive description of the relevant RICO enterprise that would elucidate the relationship between the enterprise and the non-defendant entities—in this case the other authorized Ford dealers allegedly engaged in the fraudulent ESP scheme—has been found worthy of dismissal. *Id.* at 645–46.

■ However, Williams also alleges that Ford and Highland by themselves constituted an association in fact. Although some courts have expressed contrary views, *see, e.g., In re Burzynski,* 989 F.2d 733, 743 (5th Cir.1993), it has been recognized that a RICO person can associate with an enterprise of which it is but a part. *See, MCM Partners v. Andrews–Bartlett & Assoc.,* 62 F.3d 967 (7th Cir.1995). Williams alleges that Highland and Ford operated through a structure formalized by contractual relationships that specified the manner in which the ESPs were sold and processed. He further alleges that the enterprise operated with the goal of selling and processing fraudulent ESPs. On this basis we find that Williams has adequately pleaded the existence of an association-in-fact enterprise.

Highland makes several arguments as to why Williams' complaint should be dismissed. We focus here on Highland's arguments attacking the validity of the alleged RICO enterprise, as we think these dispose of Williams' claim. Specifically, Highland contends that Williams' RICO claim must fail because he cannot show that: (1) the RICO person was distinct from the RICO enterprise, and (2) the RICO person participated in the RICO enterprise.

■ It is well settled in this circuit that liability under § 1962(c) requires that the RICO person or defendant be separate and distinct from the enterprise. *Richmond,* 52 F.3d at 646. Thus, in order to adequately plead a claim under § 1962(c), the complaint must identify an " 'association in fact' that is meaningfully different in the RICO context from the units that go to make it up." *Id.* at 647 (quoting *Richmond v. Nationwide Cassel L.P.,* 847 F.Supp. 88, 91 (N.D.Ill.1994)). Here, Williams alleges that Highland is the RICO "person" while Ford plus Highland is the RICO "enterprise." Highland argues that Williams cannot meet the separateness requirement.

■ The Seventh Circuit has dealt several times with the issue of whether a corporation and its business affiliates can constitute a separate RICO enterprise. In *Haroco, Inc. v. American National Bank and Trust Co. of Chicago,* 747 F.2d 384, 402 (7th Cir.1984), the court found that a corporate subsidiary that had conducted the affairs of its parent corporation could be found liable under § 1962(c). Other courts have been in accord in the specific instance where the subsidiary was alleged to be the RICO person, while the parent and the subsidiary were alleged to constitute the enterprise. *See Aitken v. Fleet Mortgage,* No. 90–C–3708, 1992 WL 33926, *6 (N.D.Ill. Feb.12, 1992) (approving enterprise theory that corporate member of

a group of "commonly-owned corporations engaged in the common business of commercial and consumer finance" conducted the enterprise consisting of the affiliated companies); *Robinson v. Empire of Am. Realty Credit Corp.*, No. 90–C–5063, 1991 WL 26593, *3 (N.D.Ill. Feb.20, 1991) (allowing claim alleging subsidiary conducted the affairs of its parent); *Landon v. GTE Communications Servs., Inc.*, 696 F.Supp. 1213, 1217 (N.D.Ill. 1988) (finding subsidiary distinct from parent for purposes of person/enterprise purposes). Indeed, the court has said that "[t]he only important thing is that [the enterprise] be either formally (as when there is incorporation) or practically (as when there are other people besides the proprietor working in the organization) separable from the individual." *McCullough v. Suter*, 757 F.2d 142, 144 (7th Cir.1985).

However, as Highland points out, this view is in some tension with the underlying rationale of recent Seventh Circuit case law on the issue. In *Richmond*, the Seventh Circuit endorsed the analysis employed in *Brittingham v. Mobil Corp.*, 943 F.2d 297 (3rd Cir. 1991), and the Second Circuit in *Riverwoods Chappaqua v. Marine Midland Bank*, 30 F.3d 339, 343 (2nd Cir.1994), rejecting attempts to "circumvent the distinctiveness requirement by alleging enterprises that are merely combinations of individuals or enterprises affiliated with the defendant corporation." *Brittingham*, 943 F.2d at 301–02. The *Brittingham* court noted that "when a defendant itself is a collective entity, it is more likely that the alleged enterprise is in reality no different from the association of individuals or entities that constitute the defendant or carry out its actions." *Id.* at 302. Relying on this logic, the court in *Richmond* found that the plaintiff had not stated a § 1962(c) claim where there was no showing that the RICO persons, a group of affiliated companies who had allegedly engaged in a forced insurance scheme, had conducted the affairs of the enterprise, rather than their own affairs. 52 F.3d at 647.

Recently, Judge Posner addressed the separateness issue in *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225 (7th Cir.1997), and *Emery v. American General Finance, Inc.*, 134 F.3d 1321 (7th Cir.1998). In *Fitzgerald*, the court was faced with a situation somewhat similar to what we have here. According to the complaint, Chrysler Corporation had sold consumers of its motor vehicles extended warranties providing protection that Chrysler had secretly determined not to provide, so that when a consumer would bring his car to a Chrysler dealer for repairs, and later sought reimbursement from Chrysler, Chrysler refused to pay. 116 F.3d at 226. Plaintiffs brought a class action suit under RICO, arguing that Chrysler was the RICO person and the "Chrysler family," consisting of subsidiaries of Chrysler, plus its dealers, constituted the RICO enterprise. *Id.* Judge Posner disagreed, stating as follows:

> What we cannot imagine, and what we do not find any support for in appellate case law, is applying RICO to a free-standing corporation such as Chrysler merely because Chrysler does business through agents, as virtually every manufacturer does. If Chrysler were even larger than it is and as a result had no agents, but only employees (it might own all its dealerships), it could not be made liable for warranty fraud under RICO. What possible difference, from the standpoint of preventing the type of abuse for which RICO was designed, can it make that Chrysler sells its products to the consumer through franchised dealers rather than through dealerships that it owns . . . .

*Id.* at 227.

Judge Posner extended this analysis in *Emery v. American General Finance, Inc.*, 134 F.3d 1321 (7th Cir.1998), a case that involved an alleged "loan flipping," in which a lender offers to refinance the borrower's existing loan, concealing the fact that the new terms are highly disadvantageous. Plaintiff had named a corporation, a subsidiary, and several corporate officers and employees as defendants, and alleged that the enterprise was the corporate group, while the persons were the corporation and the individual defendants. *Id.* at 1324. The court rejected the idea that the corporation could be a RICO person, stating that whether it

> operated through divisions, which would make the branch manager of [the subsidiary] who mailed the misleading letter . . . an employee of [the corporation] and would

therefore preclude a finding of a RICO enterprise on anyone's view, or through wholly owned subsidiaries is a difference unrelated to any goal or policy of RICO. The parent would be exercising power that is inherent in its ownership of wholly owned subsidiaries.

*Id.* (internal citations omitted).

Williams rightly distinguishes *Fitzgerald* and *Emery* on the basis that in those cases it was the corporate parent who was alleged to be the RICO person, which supported Judge Posner's conclusion that there was no distinction between the enterprise and person, which was simply the corporation exercising power inherent in its status as parent. *Emery,* 134 F.3d at 1324. The same is true of *Richmond,* and the Second Circuit cases upon which it relied, where the RICO person was essentially indistinguishable from the RICO enterprise. Here, of course, Williams is arguing that the dealer, Highland, is the RICO person. Thus, as plaintiff correctly points out, this is not a case where the corporate RICO person acting through its affiliates is identical to the alleged enterprise since Highland does not work through Ford, but rather is under contract with Ford to provide and process Ford's ESPs. Thus, while we acknowledge that it is not entirely consistent with the policy rationale expressed in *Brittingham* of preventing plaintiffs from circumventing the distinctiveness requirement by alleging RICO enterprises that are interrelated corporate units, we read the *Richmond–Fitzgerald–Emery* line of separateness cases narrowly and find that they apply in the specific situation where the RICO person is the parent or umbrella corporate entity. In this case, then, plaintiff has adequately alleged that Highland is distinct from the RICO enterprise comprised of Ford and its dealers under the classic standard set forth in *Haroco.* 747 F.2d at 402.

■ However, that is not the end of the inquiry under § 1962(c). Specifically, plaintiffs also have to allege that Highland did, in fact, use racketeering acts to participate in conducting the affairs of the enterprise, and that these acts were not simply committed in the conduct of its own business. *Moore v. Fidelity Financial Services, Inc.,* 949 F.Supp. 673, 679 (N.D.Ill.1997). To state a claim under § 1962(c) a plaintiff must show

that the members of the enterprise conducted or participated, "directly or indirectly, in the conduct of such enterprise's affairs ...." § 1961(c). The term "conduct" implies some degree of direction over the enterprise's activities; "participate" implies merely some part in that direction. *Reves,* 507 U.S. at 177–80, 113 S.Ct. 1163. Moreover, "liability depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Id.* at 185, 113 S.Ct. 1163.

Here, the alleged pattern of racketeering activity consists of using the mails to issue and sell ESPs that "were of no practical value because of the extremely large inspection fee" (2d am.cplt.¶ 37(a)). Williams alleges that Ford issued the ESPs and Highland sold them while acting on Ford's behalf (2d am.cplt.¶ 36). He further alleges that Ford has a written agreement with each dealer, requiring the dealer to honor the service plans and setting forth the compensation that Ford will pay the dealer for performing the repairs and service (2d am.cplt.¶ 19). However, as we stated in our July 29 order, nowhere does Williams allege that Highland exerted any type of control over the enterprise that would warrant imposing RICO liability. *See Matter of Lake States Commodities, Inc.,* 936 F.Supp. 1461, 1476–77 (N.D.Ill.1996). Instead, his allegations do nothing more than establish that Highland engaged in its own "policy and practice" of imposing undisclosed inspection fees when consumers attempted to obtain repairs under the ESPs. This, without more, does not state a RICO claim.

In his newly amended complaint Williams makes two changes in an attempt to avoid this outcome. First, he alleges that Highland "exploited" the RICO enterprise by using Ford's reputation and financial resources to fraudulently impose inspection fees on unsuspecting consumers. Without Ford underwriting the ESPs and lending an air of legitimacy, Williams argues, Highland would not be able to implement its illicit scheme. However, this bare allegation of "exploitation" is not sufficient to establish the requisite degree of participation in the enterprise to establish a prima facie RICO violation. At

best, it again only shows that Highland has been using its relationship with Ford to conduct its own affairs—in this case, imposing undisclosed inspection fees—not those of the enterprise. *See Richmond,* 52 F.3d at 647; *Moore,* 949 F.Supp. at 673. Even if Ford's affiliation with Highland was, as Williams argues, "necessary" to effectuate the illicit scheme, this does not mean that Highland was able to exert control over the affairs of the enterprise. It simply means that Highland took advantage of an opportunity to conduct its own fraudulent business practice.

The second change Williams makes is to allege an "association in fact," in the hopes of avoiding the issue of control. It is true that participants in an association in fact are not held to the same standard of conduct as are "outsiders" to a RICO enterprise. *See MCM Partners,* 62 F.3d at 979. To the contrary, where a defendant acts as a "lower-rung participant[ ] who [is] under the direction of upper management," *Reves,* 507 U.S. at 184, 113 S.Ct. 1163, and knowingly implements a scheme hatched by management, the Seventh Circuit has found that the participation prong of RICO has been satisfied. *MCM Partners,* 62 F.3d at 979. Therefore, by characterizing Highland as part of an association in fact, Williams attempts to avoid having to show that Highland exerted any influence over the RICO enterprise—which we have already found it did not do. However, Williams' complaint falls well short of adequately pleading participation, even under the more lenient standard articulated in *MCM Partners.* Nowhere does Williams allege that Highland was implementing a scheme to defraud consumers of ESPs that had been hatched by others higher up the ladder of control in the enterprise. To the contrary, aside from nonspecific assertions regarding the contractual relationship between Highland and Ford, Williams' pleadings clearly state that Highland's imposition of inspection fees was simply its own "policy and practice" (2d am.cplt.¶¶ 20–23). Williams does this, it seems, to avoid saying that it was acting at the behest of Ford and thus running into the problem of separateness that we discussed above. Nevertheless, in so doing, he undermines his claim that Highland participated in the RICO enterprise by merely carrying out the fraudulent scheme.

This case is distinguishable from the recent decision in *Miller v. Chevy Chase Bank,* No. 97–C–4494, 1998 WL 142394 (N.D.Ill. March 24, 1998), in which the court was confronted with an alleged excessive mortgage scheme perpetrated by Chevy Chase Bank and its corporate parents and subsidiaries. The court found that plaintiffs had sufficiently alleged that Chevy Chase exercised control over the parent by determining how much to demand in escrow payments on the mortgages it serviced and by "upstreaming" the income derived through the enterprise's illegal activities to its corporate parents. *Id.* *3. The situation is very different here, where there are no allegations that Ford benefitted economically from Highland's practices, and Highland did not exercise such broad control over the sale and processing of the ESPs. In *Miller,* Chevy Chase's affiliates had delegated the authority to service the mortgages at issue and had issued guidelines for escrow practices that Chevy Chase followed. *Id.* Here, Highland is merely alleged to be Ford's agent for providing services and repairs under the ESPs. It did not have the same type of discretion over the terms of the ESPs, which Highland simply took verbatim from Ford (2d am.cplt.¶¶ 10–11). The fact that Highland imposed an inspection fee does not establish the requisite control since there is nothing indicating that the fee was anything other than Highland's own policy and practice.

Finally, we think dismissal is appropriate here because this is a far cry from the type of situation RICO was enacted to prevent. As Judge Posner describes in *Fitzgerald,* the "prototypical RICO case is one in which a person bent on criminal activity seizes control of a previously legitimate firm and uses the firm's resources, contacts, facilities, and appearance of legitimacy to perpetuate more, and less easily discovered, criminal acts than he could do in his own person, that is, without channeling his criminal activities through the enterprise he has taken over." 116 F.3d at 227. Thus, he agrees that the court in *Haroco,* 747 F.2d 384, correctly found a pri-

ma facie RICO violation where it was alleged that criminals took over a corporate subsidiary which then managed to wrest control of the parent and use the parent as an instrument for further criminal activities. *Emery*, 134 F.3d at 1324. Williams has made no allegations that would bring this case within the outer reaches of such a "prototypical" case. Instead, we have a situation where a car dealer has allegedly implemented its own scheme to bilk unsuspecting consumers of automobile warranties. Highland has not "wrested control" from Ford in such a way as to convert a formerly legitimate business into a front for illegal activity.

Williams tries to argue that this is not true, since by cloaking itself with the legitimacy offered by its affiliation with Ford, Highland's fraudulent scheme has been facilitated in a way that would be impossible without Ford's presence. Thus, according to plaintiff, Highland was able to extract from its affiliation with Ford an "additional power to do evil," *Fitzgerald*, 116 F.3d at 227, which, in this case, is tantamount to converting Ford to Highland's fraudulent scheme. We think that this argument fails. Again, on the basis of the allegations in the complaint, this case appears to involve nothing more than a single automobile dealer who decided to take advantage of consumers by charging them undisclosed inspection fees. Ford was "crucial" to this plan to the extent that it issued the original ESPs. However, there is nothing to indicate that Ford either actively participated in the perpetration of this scheme, that it knowingly acquiesced in this pattern of fraud, or that it had unwittingly come under the control of Highland, who influenced it to turn its legitimate operation into a conduit of illegal activity. Of course, without Ford, there would have been no ESPs to begin with and therefore no fraudulent scheme. But, under that logic, the scope of RICO liability could be expanded indefinitely. At a minimum, there needs to be some showing that the RICO person either controlled, *Reves*, 507 U.S. at 185, 113 S.Ct. 1163, or carried out the orders of, *MCM Partners*, 62 F.3d at 979, the RICO enterprise. Here, plaintiff has not adequately made either showing. Rather, Williams has simply alleged that Highland conducted its own practice of selling fraudulent ESPs that it had obtained from Ford. This is insufficient to state a claim under § 1962(c).

### CONCLUSION

For the foregoing reasons, Highland's motion to dismiss is granted.