**NASIK BREEDING & RESEARCH FARM LTD., C & M Farming Ltd., and Silvassa Poultries Pvt. Ltd (Formerly M/S Silvassa Poultries), Plaintiffs,**

v.

**MERCK & CO., INC., Hubbard Farms, Inc., Merial LLC, Hubbard ISA, Rhone Merieux, John Preston, John Gascoyne, Robert L. Owen, Patricio Liberona, David Fyfe, Jerome Baudon, Charles W. Shaw, and Darrel D. Rector, Defendants.**

No. 00 CIV. 5628 AGS.

United States District Court, S.D. New York.

Aug. 30, 2001.

---

Rohit Sabharwal, Sabharwal & Assoc., New York City, Richard Herman, New York City, for Plaintiff.

Matthew Gluck, Bonnie Steingart, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Merck & Co., Inc.

Thomas C. Morrison, Naomi Schrag, Patterson, Belknap, Webb & Tyler, for Merial LLC and Hubbard ISA.

### OPINION AND ORDER

SCHWARTZ, District Judge.

This action arises out of a dispute over the sale of allegedly diseased breeding chickens to plaintiff Nasik Breeding & Research Farm Ltd. by defendants Hubbard Farms, Inc. and Hubbard ISA. Plaintiffs seek to rescind a settlement they entered into with certain defendants relating to the supply of such chickens, and to recover compensatory and punitive damages against defendants under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962 *et seq.*, and under state law for common law fraud, breach of contract and the implied covenant of good faith and fair dealing, fraudulent and negligent misrepresentation, tortious interference with contractual relations, and related statutory claims. Currently before the Court are defendants' motions to dismiss each of plaintiffs' claims pursuant to Fed.R.Civ.P. 12(b)(6) ("Rule 12(b)(6)") and Fed.R.Civ.P. 9(b) ("Rule 9(b)"). For the reasons set forth below, the motions are granted.

## I. Factual Background

### A. Parties

Plaintiff Nasik Breeding & Research Farm Ltd. is a company organized and existing under the laws of India with its principal place of business in Maharashtra, India. It belongs to the C & M Group, a pioneer in the Indian poultry industry and now a successful conglomerate. (First Amended Complaint ("Amend.Compl.") ¶¶ 4, 18–24.) The Group also includes

plaintiffs C & M Farming Ltd. and Silvassa Poultries Pvt. Ltd. (*Id.* ¶¶ 5–6.) Plaintiffs and their predecessors have been in the poultry business in India for over forty years, and through a series of expansions and deals, became India's largest commercial egg producers and the largest suppliers of day old broiler chicks in Western India. (*Id.* ¶¶ 18–24.) All references to "Nasik" in this Opinion hereinafter refer to each of the three plaintiffs.[1]

Defendant Merck & Co. ("Merck"), a New Jersey corporation with its principal place of business in Whitehouse Station, New Jersey, is a health care and pharmaceutical conglomerate that is engaged in the manufacture, distribution and sale of pharmaceutical and health care products worldwide. (*Id.* ¶ 7.) Defendant Hubbard Farms, Inc. ("Hubbard") was a wholly-owned subsidiary of Merck, with its principal place of business in New Hampshire, and was among the largest breeders of broiler chickens for domestic and international markets. (*Id.* ¶¶ 8, 32–39.) Following the creation of Merial Animal Health in 1997, a 50/50 joint venture between Merck AgVet, a division of Merck, and defendant Rhone Merieux, a French conglomerate, Hubbard merged with ISA, Rhone Merieux's poultry business, to form defendant Hubbard ISA. (*Id.* ¶ 9.) Hubbard ISA is a now a wholly-owned subsidiary of defendant Merial LLC ("Merial"), which is a Delaware limited liability corporation with its principal place of business in New Hampshire. (*Id.* ¶ 10; Memorandum of Law in Support of Merial and Hubbard ISA's Motion to Dismiss ("Merial and Hubbard ISA Mem.") at 3.)

Individual defendant John Preston ("Preston"), a citizen of New Jersey, is Chairman of Merial Animal Health, and, prior to the joint venture, was president of Merck AgVet. Defendant John Gascoyne ("Gascoyne"), a citizen of New Hampshire, is currently president of Hubbard ISA and was president of Hubbard. Defendant Robert L. Owen ("Owen"), a citizen of New Hampshire, is director of veterinary services at Hubbard ISA, and held the same position at Hubbard.[2] Defendants Patricio Liberona ("Liberona"), David Fyfe ("Fyfe"), and Jerome Baudon ("Baudon") are employees of Hubbard and citizens of Canada, Scotland, and Tennessee, respectively. Defendants Charles W. Shaw ("Shaw"), a citizen of New Hampshire, and Darrel D. Rector ("Rector"), a citizen of North Carolina and an employee of the State of North Carolina, are practicing veterinarians. (Amend.Compl.¶¶ 11–17.) Hereinafter all defendants are collectively referred to as "defendants."

**B. 1994 Agreement**

On November 21, 1994, Hubbard and Nasik entered into a Grandparent Breeding Stock Lines Sales and Distribution Agreement (the "1994 Agreement"), pursuant to which Hubbard agreed to sell certain lines of chicken breeding stock to Nasik for a period of five years. The chicken broiler breeding business involves four different kinds of stock: pure line stock, great-grandparent stock, grandparent stock, and parent stock. Pure line stock is used to produce great-grandparent stock, great-grandparent stock is used to produce grandparent stock, and so on. (*Id.* ¶ 26.) Pursuant to the 1994 Agree-

---

1. Nasik also makes reference throughout its Amended Complaint to certain "other distributors and customers." (*See, e.g.,* Amend. Compl. ¶¶ 49, 60.) Such undefined entities are not parties to the instant action, and are not considered in this Opinion.

2. Owen purportedly lives and works in Tennessee. (Memorandum In Support of Motion to Dismiss Individual Defendants ("Indiv.Def.Mem.") at 2.)

ment, Hubbard provided Nasik with grandparent lines in the form of day-old grandparent chicks, from which Nasik would produce parent stock for distribution and sale. (*Id.* ¶ 27.) Nasik agreed to maintain a strict set of quality controls in exchange for its right to breed and distribute Hubbard's chickens. (1994 Agreement, Affidavit of Matthew Gluck dated Aug. 31, 2000 ("Gluck Aff."), Ex. D, §§ VI, VII, VIIII, X.) The 1994 Agreement also (i) appointed Nasik as Hubbard's exclusive distributor in India and neighboring countries, (ii) required that Nasik obtain Hubbard's consent to sell or distribute hatching eggs, chicks, or breeding stock other than those purchased from Hubbard, and (iii) gave Hubbard the right to inspect Nasik's stock for communicable disease, which occurred through quarterly inspections of Nasik's hatcheries by Hubbard veterinarians. (Amend. Compl. ¶¶ 40–43; 1994 Agreement §§ III, IX, X.)

## C. Misrepresentations by Defendants Regarding Diseased Chickens

According to Nasik, chicken breeding stock is commonly susceptible to various forms of disease, and because of the costs involved in producing such stock, "great care must be taken to ensure that Breeding Stock is free from diseases, which can ultimately impair or destroy the value of the flocks produced by that Breeding Stock." (Amend.Compl.¶ 63.)

In or about late 1995 or early 1996, Merck and Hubbard allegedly discovered that certain of the latter's pure line and grandparent breeding stock was susceptible to, and certain lines were in fact afflicted by, a virulent cancer virus.[3] (*Id.* ¶ 48.)

Nasik alleges that over approximately the next 18 months, defendants concealed the problem because of fears of eroding market share and the possible effect such news could have on Merck's upcoming merger with Rhone Merieux, and conspired to distribute and sell diseased breeding stock worldwide in order to continue reaping profits from such sales. Pursuant to the alleged conspiracy, diseased chicks were diverted to India and other third world countries "where defendants believed that early detection of the disease would be unlikely." (*Id.* ¶¶ 48, 49, 70–77.) Nasik further alleges that Hubbard representatives were told not to reveal the disease unless a customer first produced evidence of its existence. (*Id.* ¶¶ 77, 84, 92.) The alleged deception also included the procurement of false export certificates from the United States Department of Agriculture ("USDA"), which, Nasik claims, are intended in part "to ensure that animals, poultry, semen, embryos, and hatching eggs intended for export are free from evidence of communicable disease and exposure thereto . . . ." (*Id.* ¶¶ 49, 51–62, 99, 102.) The "issuing veterinarians" for such certificates were Shaw and Rector. (*Id.* ¶ 100.)

The fraud allegedly resulted in the virtual destruction of Nasik's broiler chicken business, through loss of sales, reputation, and goodwill. (*Id.* ¶¶ 50, 96–97.) Nasik states that it noticed a high mortality rate among its Hubbard breeding stock, beginning in early 1996 and continuing throughout 1996. Upon inquiries by Nasik through the middle of 1997, defendants failed to disclose the virus. On July 31, 1997, after a visit to Nasik's facilities, Owen stated that Hubbard's flocks were

---

**3.** The virus, called Avian Leukosis Virus–Subgroup J, causes a form of bone marrow cancer in chickens and affects broiler chickens such as those sent to Nasik more than other breeds. (Amend.Compl.¶ 68.) The disease is communicated both vertically (from parent to chick) and horizontally (by close contact with infected chickens during rearing). (Amend. Compl.¶ 69.)

infected with the cancer virus. (*Id.* ¶¶ 78, 84, 90.) Subsequent testing resulted in the destruction of the overwhelming majority of Nasik's then-existing stock, and damages of approximately $40 million. (*Id* . ¶¶ 96, 104, 133.) Nasik claims it discovered the alleged fraud in October 1997 in further discussions with Hubbard representatives. (*Id.* ¶ 92.)

## D. 1998 Settlement, Release, and New Agreement

After the July 1997 disclosure of the cancer virus by defendants, Nasik requested $46 million in compensation from Hubbard and the parties entered into settlement discussions. (*Id.* ¶¶ 104–105 .) On January 22, 1998, Nasik's former counsel, Kelley Drye & Warren, sent Merck a draft complaint (the "Draft Complaint") alleging claims against Merck, Hubbard, Merial, Preston, Gascoyne, and Owen for fraud, breach of contract and RICO violations in connection with the 1994 Agreement and the events described above. (Draft Complaint, Ex. B to Gluck Aff.) On February 26, 1998, attorneys for the parties entered into a Standstill Agreement to explore the possibility of settlement. Settlement meetings and communications occurred over the next nine months, principally in the six months between May and November 1998. The principal negotiators were Paul Doyle, a Kelley Drye attorney, for Nasik, and Michael Hacker ("Hacker"), Merck's Vice–President and Assistant General Counsel, for defendants. (*Id.* ¶¶ 106–115.)

On November 9, 1998, Nasik and Merck, Hubbard, Merial and Merial Ltd., with the guidance of their respective counsel, entered into a Release Agreement (the "Release"). (*Id.* ¶¶ 115–116; Release, Ex. A to Gluck Aff.) Nasik agreed to a broad release of claims against the challenged entities arising out of the alleged fraud. The Release states, in pertinent part:

> C & M Group and each of them and their affiliates do hereby release and discharge Merck, Hubbard, Merial, Merial Ltd. and each of them and their affiliates, their respective directors, officers, employees and agents . . . including, but not limited to, John Preston, John Gascoyne and Robert L. Owen from all causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law, admiralty or equity, which against them, C & M Group and its affiliates, their successors and assigns ever had, now have, or hereafter can, shall, or may have, for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of this Agreement . . . .

(Release ¶ 4.) The C & M Group entities also executed certain individual releases. (Individual Releases, Ex. A to Gluck Aff.)

As part of their settlement, the parties also agreed that Nasik and Hubbard ISA—which had by then replaced Hubbard—would enter into a new distribution agreement designed to "rehabilitate" Nasik, to enable it to "recover from its losses and recover its business and market share." (Amend.Compl.¶¶ 116, 117.) Nasik also received $4 million in cash, an interest free loan of $7.5 million, the forgiveness of indebtedness for prior shipments, and shipments free of charge for the first year of operation of the new Agreement, which was signed on the same day as the Release, November 9, 1998 (the "1998 Agreement").[4] (*Id.* ¶¶ 116–18; Re-

---

4. The 1998 Agreement, like the 1994 Agreement, was entitled "Grandparent Breeding

lease; 1998 Agreement; Original Complaint ¶ 116.)

The 1998 Agreement's basic bargain is essentially the same as that which embodies the 1994 Agreement; Hubbard ISA agreed to ship grandparent breeding stock to Nasik for the latter's sale and distribution in India and neighboring countries over a five year period.[5] The quality control standards are equally stringent. (1998 Agreement §§ VIII, IX, X, XII, XIII.) However, because of the events which allegedly transpired under the 1994 Agreement, the representations and warranties and remedy provisions were revised and further elaborated. The representations and warranties are discussed further below in the context of Nasik's fraudulent inducement claims. *See* Part III.C, *infra.* With regard to remedies, the Agreement allows for flexibility if Hubbard ISA is unable to provide the intended stock; for Hubbard ISA by allowing it to substitute other suitable breeds acceptable to Nasik, and for Nasik by allowing it to purchase chicks from third parties to the extent Hubbard ISA is unable to fulfill its order within 90 days, or, in certain cases, to terminate the Agreement if Hubbard is unable to perform. (1998 Agreement §§ II–D, IV–C, IV–D, XVIII–C.) Further, the Agreement recognized that, in some cases, Hubbard ISA would be unable to detect problems with the shipment (e.g.disease) at the time of purchase. Accordingly, Nasik agreed, as its sole and exclusive remedy, that Hubbard ISA would be able to replace the chicks sent or refund the purchase price if the chicks (i) "fail to live or grow to [Nasik's] reasonable satisfaction until they reach seven (7) days of age," or are otherwise not in good condition to the extent ascertainable by Hubbard at the time of shipment, or (ii) develop a diseased condition after reaching 7 days of age but before reaching 30 weeks of age. (*Id.* §§ XVI–C, XVI–D, XVI–E.) As noted *supra,* the agreed minimum quantity of stock would be provided free of charge for the first year of the Agreement. (*Id.* § V–C.)

### E. Further Shipments and Additional Misrepresentations

Nasik alleges that, during the course of the settlement discussions, defendants "made various express and implied representations to Nasik that the stock supplied from May 1998 onwards would be free of disease," on which Nasik relied in entering into the Release. (Amend.Compl.¶¶ 119, 120.) Hubbard supplied chicks to Nasik under the 1994 Agreement during the settlement discussions from May to November 1998, and thereafter pursuant to the 1998 Agreement. Nasik claims that from February 1999 it discovered that the new chicks which had been provided (i) were not of the breed that Nasik understood was to be provided, and (ii) also suffered from disease, including the cancer virus that had affected previous shipments as well as other ailments. Defendants purportedly concealed this information, resulting in additional Nasik losses of $50 million. (*Id.* ¶¶ 122–126, 133.)

### F. Instant Action

Nasik filed the instant action on July 28, 2000; its RICO statement was filed on August 21, 2000. On August 31, 2000, Merck moved to dismiss all claims against it pursuant to Rules 12(b)(6) and 9(b). On

---

Stock Lines Sales and Distribution Agreement." (1998 Agreement, Ex. E to Gluck Aff.)

5. There is also a provision in the 1998 Agreement allowing Nasik to order parent stock if Hubbard ISA accepts such order, which it may do at its discretion. (1998 Agreement § II–B.)

October, 4, 2000, Nasik filed an Amended Complaint, revising the existing claims and adding new claims and defendants. Nasik seeks (i) a declaratory judgment that the Release and the 1998 Agreement, including the latter's limitation of damages provisions, are null and void on the grounds of fraud and duress, and (a) $40 million in damages for allegedly diseased breeding stock received in 1996, 1997, and early 1998, less the amount actually received pursuant to the settlement, and (b) $50 million in damages for defendants' allegedly fraudulent actions after May 1998. In addition, Nasik alleges claims, for the period before, during, and following the settlement, for (i) federal and New Jersey state RICO violations against all defendants, (ii) common law fraud and negligent misrepresentation against all defendants, (iii) breach of contract and the covenant of good faith and fair dealing against Hubbard, (iv) tortious interference with contractual relations against Merck, Merial, Rhone Merieux, Preston, Gascoyne, Owen, Liberona, Fyfe, and Baudon, and (v) violation of the New Jersey Consumer Fraud Act ("NJCFA") against all defendants. (*Id.* ¶¶ 132–182.) Defendants Merck, Merial, Hubbard, Gascoyne, Owen, Baudon, Shaw, and Rector (collectively, the "moving defendants") now move to dismiss the claims against them for failure to state a claim under Rule 12(b)(6) and/or failure to plead fraud with particularity under Rule 9(b).[6] Defendants Shaw and Rector also move to dismiss pursuant to Fed.R.Civ.P. 12(b)(2) ("Rule 12(b)(2)") for lack of personal jurisdiction.

## II. Motion to Dismiss Standard

On a Rule 12 motion to dismiss, the Court must accept the factual allegations contained in the complaint, and the RICO statement where RICO claims are asserted, as true, and draw all reasonable inferences in favor of the plaintiff. It should not dismiss the complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (noting that factual allegations in the complaint must be accepted as true on motion to dismiss); *McLaughlin v. Anderson,* 962 F.2d 187, 189 (2d Cir.1992) ("In analyzing the issues on this motion to dismiss, we must take as true the facts as alleged in the complaint and as supplemented by the RICO case statement ordered by the district court."). In deciding the motion, facts alleged in the complaint or in documents attached to the complaint as an exhibit or incorporated in it by reference, matters of which judicial notice may be taken, or documents either in the plaintiff's possession or of which the plaintiff had knowledge and relied on in bringing suit.[7]

6. These defendants are apparently the only defendants who have been served. (Indiv. Def. Mem. at 2.) Three motions have been filed, by (i) Merck, (ii) Merial and Hubbard, and (iii) the individual defendants. Hacker, who was previously named as a defendant in this action, also moved to dismiss. Because he has been dismissed with prejudice as a defendant pursuant to a stipulation entered on December 13, 2000, his requested relief is moot.

7. Merck has submitted several documents, which are referenced in the Amended Complaint, incorporated therein, or which were clearly in Nasik's possession and relied on by Nasik in filing suit. These documents include the 1994 Agreement, the Draft Complaint, the Release, the 1998 Agreement, a letter from Nasik's former counsel to Nasik containing drafts of the 1998 Agreement, and a USDA export certificate for chicks sent from Hubbard to Nasik in February 1996. (Exs. A–E to Gluck Aff.; Supplemental Affidavit of Mat-

*See Brass v. Am. Film Tech., Inc.,* 987 F.2d 142, 150 (2d Cir.1993); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991).

## III. Voidability of the Release and 1998 Agreement

Nasik's Amended Complaint asserts claims against defendants for alleged violations that allegedly occurred before, during and after the parties' 1998 settlement. The discussion below first considers those claims arising out of the negotiation of the settlement, namely, the Release and the 1998 Agreement, because, the Court finds, these are the only claims properly before the Court.

 Under New York law, "a valid release which is clear and unambiguous on its face and which is knowingly and voluntarily entered into will be enforced as a private agreement of the parties." *Du-Fort v. Aetna Life Ins. Co.,* 818 F.Supp. 578, 581 (S.D.N.Y.1993) (citations omitted). Such a release will be binding on the parties absent a showing of fraud, duress, undue influence, or other valid defense. *Id.* (citation omitted). Nasik claims that the Release, and the 1998 Agreement, which was signed as part of the settlement which also included the Release, are invalid on grounds of economic duress and fraud. (Amend.Compl.¶ 133.)

thew Gluck dated Oct. 25, 2000, Ex. F; Merial and Hubbard's Reply Brief in Support of Their Motion to Dismiss ("Merial and Hubbard Rep."), Ex. A.) The Court considers such documents on the instant motions to dismiss.

8. Nasik also states, although it appears contrary to the facts laid out in the Amended Complaint, that "the heart of this case involves a series of frauds perpetrated by the defendants in New York in violation of the laws of the State of New York." (Memorandum of Law in Opposition to Defendants Hubbard ISA and Merial LLC's Motion to

## A. Choice of Law

The Court finds that Nasik's claims are governed by New York law, unless they specifically state otherwise, i.e. its New Jersey RICO and NJCFA claims. The Release contains a choice of law provision which states that

This Agreement shall be governed by the laws of the State of New York and any action arising out of this Agreement shall be brought either in the Supreme Court of the State of New York or the United States District Court for the Southern District of New York and all parties consent to jurisdiction and venue in said courts.

(Release ¶ 7.) While Nasik challenges the validity of the Release, it does not take issue with the choice of law provision; and both parties refer principally to New York cases in support of their respective positions.[8] Thus, the parties, by implication, agree that there is no dispute on the choice of law question. Moreover, the courts of this Circuit have routinely enforced similar choice of law provisions even when a party challenges the contract as fraudulent or claims of fraudulent inducement exist. *See Turtur v. Rothschild Registry Int'l Inc.,* 26 F.3d 304, 309–10 (2d Cir.1994); *The Benett Funding Group, Inc. v. The Aegis Consumer Funding Group, Inc.,* 259 B.R. 243, 251 (N.D.N.Y. 2001).[9]

Dismiss the Complaint ("Pl. Opp. Hubbard and Merial") at 20.)

9. When the choice of law provision is more narrowly tailored, some courts have declined to apply the chosen law to claims that may fall outside of the provision's ambit. *See Krock v. Lipsay,* 97 F.3d 640, 645 (2d Cir. 1996) (distinguishing the language of the choice of law provision at issue there from that in *Turtur,* the latter which parallels the provision in the instant case).

## B. Economic Duress

Nasik asserts that it "only entered into [the Release and the 1998 Agreement] because it was on the verge of bankruptcy, and did not have the time and resources to litigate against several multinational conglomerates." (Memorandum of Law in Opposition to Defendant Merck's Motion to Dismiss the Complaint ("Pl. Opp.Merck") (citing Amend. Compl. ¶ 121).) It further states that "the purpose of the Settlement was not to compensate Nasik for the losses caused to it by the other parties to the Settlement, but to rehabilitate Nasik, so that Nasik could recover from its losses and recover its business and market share." (*Id.* ¶ 117.) "Thus, Plaintiffs were forced into the settlement to recuperate from said losses." (Pl. Opp. Hubbard and Merial at 8.)

 Nasik's contentions are unavailing. "The doctrine of economic duress arises from the theory that the courts will not enforce an agreement in which one party has unjustly taken advantage of the economic necessities of another and thereby threatened to do an unlawful injury."[10] *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 122 (2d Cir.2001) (citations and internal quotations omitted). "A party seeking to avoid a contract because of economic duress shoulders a heavy burden." *Orix Credit Alliance, Inc. v. Bell Realty, Inc.*, No. 93 Civ. 4949, 1995 WL 505891, at *3 (S.D.N.Y. Aug.23, 1995) (quoting *Int'l Halliwell Mines v. Continental Copper & Steel Indus.*, 544 F.2d

105, 108 (2d Cir.1976)). In order to state a duress claim, a plaintiff must establish that there was: (i) a threat; (ii) which was unlawfully made; (iii) which caused involuntary acceptance of contract terms; and (iv) where the circumstances permitted no other alternative to accepting the imposed terms. *Kamerman v. Steinberg*, 891 F.2d 424, 431 (2d Cir.1989). Here, Nasik fails to allege the existence of any wrongful threat; it alleges only that its own difficult financial circumstances necessitated signing the agreements at issue. The absence of such a threat is fatal to its economic duress claim. *See Harless v. Research Instit. of Am.*, 1 F.Supp.2d 235, 242 (S.D.N.Y.1998) (finding that release could not be voided on grounds of economic duress where plaintiff failed to assert that his signing of the release was the product of a threat); *Sotheby's, Inc. v. Dumba*, No. 90 Civ. 6458, 1992 WL 27043, at *4 (S.D.N.Y. Jan.31, 1992) ("[A] party must establish that the agreement at issue was procured by means of a wrongful threat which eliminated the party's free choice by foreclosing all practical alternatives.") *cf. Hellenic Lines Ltd. v. Louis Dreyfus Corp.*, 372 F.2d 753, 758 (2d Cir.1967) (stating the duress is not proved where plaintiff "merely exercised its business judgment in a difficult situation"). Nasik evidently had the option of turning down the settlement and pursuing a legal claim.

 Moreover, under New York law, "[a] contract or release, the execution of which is induced by duress, is voidable,"

---

**10.** As the Second Circuit has recently stated:

The requirement that the party claiming duress disclaim the contract or release about which he is complaining promptly or be held to have forfeited his right to do so protects the stability and reliability of such agreements by denying the weaker party the "heads I win, tails you lose" option of waiting to see how the arrangement works out and then deciding whether to seek to

undo it . . . . [T]he requirement of prompt disavowal after execution is fair to the disadvantaged party, who will ordinarily know at the time he executes the instrument that he is being economically coerced. He will therefore be able to disclaim the instrument immediately if he was forced into it by economic duress and wishes to avoid its effect.

*VKK Corp.*, 244 F.3d at 123–24.

rather than void; therefore, "the person claiming duress must act promptly to repudiate the contract or release or he will be deemed to have waived his right to do so." *Vkk Corp.*, 244 F.3d at 122 (citations and internal quotations omitted). "If the releasing party does not promptly repudiate the contract or release, he will be deemed to have ratified it." *Id.* "The burden on a party seeking to avoid contractual obligations on the grounds of economic duress increases proportionately with the delay in initiating suit or otherwise repudiating the contract in question." *Id.* Delays as short as six months have been held to constitute forfeiture of the claim. *See DiRose v. PK Mgmt. Corp.*, 691 F.2d 628, 634 (2d Cir.1982) (collecting cases in which delays ranging from six months to two years constituted forfeiture); *cf. VKK Corp.*, 244 F.3d at 123 (finding that economic duress claim was invalid where it was asserted 30 months after entry into the release). In this case, Nasik waited 20 months from the signing of the Release and 1998 Agreement before challenging them, which is simply too long a period to have waited if Nasik believed it had been coerced into signing.[11] *See VKK Corp.*, 244 F.3d at 124 (finding same for a year period in the case of an alleged conspiracy). Accordingly, the Court finds, Nasik forfeited its right to assert economic duress.[12]

## C. Fraudulent Inducement and Concealment

▮▮▮ In order to plead a cause of action for common law fraud or fraudulent inducement under New York law, a plaintiff must allege that (i) the defendant made a material false representation, (ii) the defendant intended to defraud the plaintiff thereby, (iii) the plaintiff reasonably relied upon the representation, and (iv) the plaintiff suffered damage as a result of such reliance. *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir.1995) (citations omitted); *see also Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 104 (2d Cir.2001) (citing *Jo Ann Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y.2d 112, 119, 302 N.Y.S.2d 799, 250 N.E.2d 214 (1969) ("A New York common law fraud claim is defined as a representation of fact, which is untrue and either known by defendant to be untrue or recklessly made, which is offered to deceive and to induce the other party to act upon it, and which causes injury.")); *Tyson v. Cayton*, 784 F.Supp. 69, 72–73 (S.D.N.Y.1992) (discussing fraudulent inducement). To establish fraudulent concealment, a plaintiff must also prove that the defendant had a duty to disclose the material information. *Brass*, 987 F.2d at 152. Fraud allegations are subject to the particularity requirement of Rule 9(b), which states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Rule 9(b). Specifically, the plaintiff must " 'specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements.' " *Suez Equity Investors*, 250 F.3d

---

**11.** The record reflects that Nasik knew of the cause of its alleged economic duress, i.e. defendants' previous fraudulent behavior and the resultant economic impact, when it signed the Release. This rules out a tolling claim based on later discovery of the potential for duress. *See VKK Corp.*, 244 F.3d at 124–25.

**12.** The Court notes that, in its opposition papers, Nasik does not contest defendants' allegations concerning the absence of duress. (Pl.Opp.Merck.)

at 95 (quoting *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989)). "Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation [therein]." *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987). The moving defendants claim that Nasik's allegations with respect to the settlement are insufficient to state a fraud claim. The Court agrees.

### 1. Release

■ Even accepting the allegations in the Amended Complaint as true, and reading them in the light most favorable to Nasik, the Court finds that Nasik has failed to adequately plead that it was fraudulently induced into signing the Release. In support of its assertions of fraud, Nasik relies on a single statement by Hacker, Merck's Vice President and Assistant General Counsel, unspecified statements by other individual defendants, the USDA certificates, and the failure of defendants to disclose three statements that appeared in written correspondence among certain of the individual defendants. The Court considers each of the alleged misrepresentations in turn.

First, Nasik asserts that it principally relied on a statement by Hacker at a May 15, 1998 settlement meeting, described in the Amended Complaint as follows:

The issue of Nasik's rehabilitation was specifically discussed and part of such discussion was the supply of disease free chickens. Specifically, Hacker offered to rehabilitate Nasik by supplying chickens under a new distributorship agreement for a period of five years (out of which the supply for the initial year would be free of cost). *Hacker stated that the chickens in Hubbard's facilities had been tested and that the chickens were found to be free and clear from disease.* Furthermore, any supply of chickens would have been, as required by law, accompanied by USDA certificates, which certificates would certify the chickens to be free and clear of disease. *Hacker clearly indicated that the supply of chickens during and after settlement would be free and clear of disease.* This statement was false and misleading. Nasik relied on such representations by Hacker.

(Amend.Compl.¶ 113) (emphasis added). This paragraph reflects that Hacker made a statement with regard to favorable test results at Hubbard ISA's facilities before the settlement meeting, which Nasik allegedly believed to be an indication, or something akin to a guarantee, that all future shipments of chickens would be free from disease. Nasik's submissions on the motions reflect that only a single statement was made; specifically, the relevant portion of the same paragraph is transcribed, possibly from a draft complaint, in two of Nasik's briefs as follows:

... *Hacker stated that the chickens were found to be free and clear of disease, thus clearly indicating that the supply of chickens during and after settlement would be free and clear of disease. This statement* was false and misleading and was justifiably relied upon by Nasik.

(Pl. Opp. Merck at 6; Pl. Opp. Hubbard and Merial at 12) (emphasis added).

As the moving defendants point out, Hacker's statement regarding the stock at Hubbard ISA's facilities merely reflected the health of chickens as of May 15, 1998, which, on its own, is neither materially false nor misleading. Moreover, even if Hacker's statement could be construed, in the context of the alleged discussion, as a promise of disease free chickens from that date forward, Nasik is unable to establish

that it reasonably relied on such statement in entering into the Release. Just two months after Hacker's statement, in the course of negotiations on the terms of the 1998 Agreement, Hubbard ISA refused to agree to Nasik's proposal for a warranty provision stating that "[Hubbard ISA] shall deliver the Products in good condition and free of significant disease." (Ex. F to Gluck Aff.) The final 1998 Agreement, signed contemporaneously with the Release, not only lacked a provision guaranteeing the health of breeding stock, but contained a *warranty disclaimer*, which stated that

> UNLESS OTHERWISE EXPRESSLY STATED IN THIS AGREEMENT, ALL CONDITIONS, WARRANTIES, STIPULATIONS OR OTHER STATEMENTS CONCERNING THE PRODUCTS, WHETHER EXPRESS OR IMPLIED, BY STATUTE, AT COMMON LAW OR OTHERWISE ARE EXCLUDED. IN PARTICULAR (BUT WITHOUT LIMITATION OF THE FOREGOING), THE BREEDER GRANTS NO WARRANTIES REGARDING THE FITNESS FOR PURPOSE, PERFORMANCE, USE, NATURE OR QUALITY OF THE PRODUCTS.[13]

(1998 Agreement § XVI–I.) Thus, the Court finds that Hacker's statement is not properly asserted as a basis for Nasik's fraudulent inducement claim.

 Second, Nasik alleges that, during settlement discussions on July 4, 1998, certain Hubbard ISA employees, including Gascoyne and Fyfe, "vigorously promoted their products and made many references to the very high productive traits and various lines they had supplied and would

supply to Nasik in the future." (Amend. Compl.¶ 119.) However, the vigorous promotion of Hubbard ISA's stock, without more, is not a misrepresentation. Terms like "very high productive traits," which do not set forth a concrete representation as to the company's future performance, are in the nature of commercial puffery and cannot form the basis for a fraud claim here. *See, e.g., Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir.1994) ("[S]tatements will not form the basis of a fraud claim when they are mere 'puffery' . . . ."); *Hubbard v. Gen. Motors Corp.*, No. 95 Civ. 4362, 1996 WL 274018, at *6 (S.D.N.Y. May 22, 1996); *In re All Terrain Vehicle Litigation*, 771 F.Supp. 1057, 1061 (C.D.Cal.1991) (finding that the defendant's advertising statements claiming that the "all terrain vehicles" were "precisely balanced in the frame for superb handling," and "the ultimate recreational vehicle," were mere puffery, which did not support a fraud claim); *cf. Cohen*, 25 F.3d at 1172 (stating that a relatively concrete representation as to a defendant's future performance, if made at a time when the speaker knows that the represented performance cannot be achieved, may ground a claim of fraud) (citation omitted). Moreover, Nasik fails to indicate any specific statement made or by whom, which is insufficient to satisfy the particularity requirement of Rule 9(b). Nasik's allegation, in the same context, that "[d]uring the course of discussions relating to the Settlement, defendants Merck, Merial, Hubbard, and Gascoyne made various express and implied representations to Nasik that the chickens supplied from May 1998 onwards would be free of disease" fails to form the basis for a fraud claim on the same rationale. (Amend.Compl.¶ 119.)

---

**13.** Additional aspects of the 1998 Agreement reflecting the unreasonableness of reliance on an expansive interpretation of Hacker's alleged statement are discussed in the next subsection. It should also be noted that the 1994 Agreement also contained a blanket disclaimer of all warranties, except as expressly stated in that Agreement. (1994 Agreement § XIX.)

Third, Nasik asserts that it relied, to its detriment, on misleading USDA certificates which (i) were "issued" by defendants and (ii) which "ensure to the importing country (in this case, India) and the importer (in this case, Nasik) that the product is good and free and clear of diseases." (Pl. Opp. Hubbard and Merial at 7.) However, the USDA certificates are not representations by defendants, but of USDA, even if, as Nasik asserts, the USDA endorsing veterinarian relies on Shaw's and Rector's certifications in providing the endorsement. (Amend. Compl. ¶ 55.) Further, as the moving defendants point out, while such certificates reflect the visible condition of a particular flock at the hatchery at the time of inspection, they clearly do not warrant that the stock in question, or future chickens, will not develop disease or growth problems.[14] Thus, even if the Court determined that the USDA certificates could be construed as statements to Nasik by private veterinarians Shaw and Rector or by defendants as a whole, it would not be reasonable for Nasik to rely on the certificates as a general testament to the health of Hubbard ISA's breeding stock for the purpose of entering into the Release.

Fourth, Nasik claims reliance on three alleged omissions, namely, internal statements by Hubbard ISA employees that were not disclosed to Nasik during settlement discussions. The first statement, a notation by Owen on a letter from Baudon to a Dr. Patil of Nasik, reads: "Jerome—India has no clue about Salmonella. It will not hurt them, but I question the use of Avigard. Otherwise services look OK." (Amend.Compl.¶ 128.) Avigard is a bacterial spray used to protect poultry from disease, which Nasik states also "masks

infection by Salmonella." (*Id.;* Merial and Hubbard Rep. at 7.) On the same letter is a follow-up comment from Baudon which reads: "David, RLO said services are OK ... Let's spray Avigard unless Dr. Patil refuses—Best regards Jerome." (Amend. Compl. § 128.) The second statement, contained in fax from Liberona to Fyfe dated August 31, 1998, states that "runting/stunting problems is not new and unusual in 'some' Shaver crosses." (*Id.* ¶ 129.) Shaver crosses are a breed of chicken that was sent to Nasik "pursuant to the Settlement." (*Id.;* Merial and Hubbard Rep. at 7.) The fax also purportedly discusses the fact that runting and stunting could be an infectious disease or even a genetic problem. (Amend Compl. ¶ 129.) The third statement, a notation by Fyfe dated October 1998 on a July 8, 1998 fax from Gascoyne to Baudon regarding shipments to Nasik, reads in pertinent part, "Last GPs deliveries to India are all severely affected by a suspect REO-virus infection (T.B.C.) which will mean we will have to replace some if not all." (*Id.* ¶ 130.)

Nasik contends that these statements were fraudulently concealed, and that they "further demonstrate that [defendants] ... knew about the falsity of their representations being made to Nasik during the settlement discussions during the period May 1998 to November 1998, and reflect their intention to fraudulently induce Nasik into the settlement." (Memorandum of Law in Opposition to Individual Defendants' Motion to Dismiss the Complaint ("Pl.Opp.Indiv.Def.") at 12 (citing Amend. Compl. ¶ 127).) Under New York law, "omissions of material facts may

---

14. The Certificates merely certify that the flock (i) was inspected within 30 days prior to shipment, (ii) was found "free of evidence of communicable diseases," on "visible evidence ... observed on the inspection dates listed," and (iii) have not been exposed to certain enumerated diseases. (Ex. A to Merial and Hubbard Rep.)

rise to a level constituting fraud, and serve as a basis for money damages, or a recission or release." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank,* 731 F.2d 112, 123 (2d Cir.1984) (citations omitted). "Before such omissions can be labelled fraudulent, however, there must be a showing that a duty of disclosure existed." *Id.* (citations omitted). In business negotiations, an affirmative duty to disclose material information may arise from the need to clarify a party's partial or ambiguous statement, or from a fiduciary relationship between the parties. *Banque Arabe,* 57 F.3d at 155 (citations omitted). A duty to disclose may also arise, as Nasik claims in this case, where (i) one party has superior knowledge of certain material information, (ii) which is not readily available to the other party, and (iii) knows that the other party is acting on the basis of mistaken knowledge. *Id.* (citations omitted).

Nasik states that the concealment of the three statements in question amounted to a "second fraud." (Amend.Compl.¶¶ 122–131.) However, even if they were material,[15] none of the statements could have been reasonably relied upon by Nasik, because such reliance is grounded on Nasik's unreasonable belief that the breeding stock to be supplied pursuant to the settlement would be free and clear of disease. The end result is that Nasik's fraudulent inducement allegations are based solely on defendants' non-disclosure of these three allegedly fraudulent statements. Such non-disclosure is not, as Nasik contends, a "second fraud," but only part of the original alleged fraud which was settled pursuant to the Release and the 1998 Agreement. The invocation of the specter of non-disclosure in order to overturn settlements has been repeatedly criticized. Specifically, under the law of this Circuit, when parties have settled a fraud claim, as the parties have done here, the attempt to overturn the settlement on the basis of the non-disclosure of the defendants' wrongdoing is improper, even where a fiduciary duty or a duty to disclose existed. In a case where shareholder plaintiffs sought to set aside a settlement on the ground that the main corporate debtor did not disclose the extent of his fraud, the Second Circuit stated:

> [E]ven fraud cases can be settled. A settlement is the price of peace. There is no prerequisite to the settlement of a fraud case that the defendant must come forward and confess to all his wrongful acts in connection with the subject mat-

---

**15.** It appears that the first two statements would not be material to Nasik's decision to enter into the Release, because they do not relate to shipments made to Nasik, and are inapposite to whether Hubbard ISA knowingly delivered diseased stock. The first statement does not indicate that Hubbard ISA's chickens were infected with Salmonella, or were prone to such infection; nor does it suggest that there was "an unabashed conspiracy" to hide such disease from Nasik during "settlement discussions." (Amend. Compl.¶ 128.) Rather, the correspondence plainly indicates the employees' reserve to spraying chickens with Avigard, and their eventual decision to do so unless Nasik refused, presumably to prevent the occurrence of Salmonella. Hubbard ISA and Merial state that, at the time of the letter, Hubbard ISA was reevaluating the use of Avigard, which has been routinely used in the belief that it helped prevent Salmonella. (Merial and Hubbard Rep. at 7.) Similarly, the second statement merely reports a finding regarding a subset of Shaver cross chickens, at a time preceding their provision to Nasik. Nasik itself points out a later e-mail from Gascoyne to Nasik in August 1999 in which he stated that runting and stunting in those Shaver crosses sent to Nasik "is not an inevitable consequence of what was sent." Contrary to Nasik's contention, (Amend.Compl.¶ 129), this statement does not contradict the earlier statement, or evidence a fraud; it merely reflects Hubbard ISA's belief that the chickens that it was sending to Nasik were not susceptible to runting or stunting.

ter of the suit. Usually such settlements are accompanied by vigorous denials of any fraud whatsoever.

*Alleghany Corp. v. Kirby,* 333 F.2d 327, 333 (2d Cir.1964), *aff'd on reh'g,* 340 F.2d 311 (2d Cir.1965) (*en banc; per curiam* ); *accord Bellefonte Re Ins. Co. v. Argonaut Ins. Co.,* 757 F.2d 523, 527 (2d Cir.1985) ("[P]laintiffs' argument is, in essence, that where the parties have sought to settle a claim of fraud, they cannot be bound by a settlement agreement unless the alleged defrauder has made full disclosure to the other party prior to settlement. We know of no authority to that effect, and we find the contrary principle established by [*Alleghany* ]."); *Tyson,* 784 F.Supp. at 74 (dismissing fraudulent concealment claim based on facts allegedly hidden by boxer's manager, where parties had settled the fraud claim and entered into new contract, and stating that "the purpose of settlement is to end litigation, not to provide a breather before the next round"). This line of cases also counsels against Nasik's attempt to rescind the Release in the instant case.

 For similar reasons, the Court finds that defendants had no duty to disclose the alleged statements to Nasik. Although knowledge of the alleged virus was solely in the hands of Hubbard ISA and/or its employees, Nasik will be unable to prove that Hubbard ISA knew Nasik was acting on the basis of "mistaken knowledge." In particular, the Amended Complaint does not allege, nor do the facts pleaded suggest, that defendants "knew that Nasik was only entering into the Settlement Agreement because it believed that it would be receiving healthy, non-experimental stock . . . ." (Pl. Opp. Merial and Hubbard at 13.) Moreover, Hubbard ISA's refusal to accept a warranty acknowledging that the stock would "free of significant disease," and its subsequent warranty disclaimer in the 1998 Agreement indicates that Nasik and Hubbard ISA both understood that disease was a possibility.

Accordingly, the Court declines to order that the Release be rescinded on the ground of fraud.

**2. 1998 Agreement**

 The Court arrives at a similar conclusion with respect to the 1998 Agreement. To begin with, the Agreement contains a broad arbitration clause which, on its own, precludes the Court's consideration of Nasik's fraudulent inducement, fraudulent concealment, and other claims which arise therefrom. Specifically, Section XIX of the Agreement provides, in pertinent part:

A. Any dispute, controversy or claim arising out of or relating to this Agreement, or the breach thereof, which cannot be amicably settled, shall be finally settled by arbitration to be held

1. if initiated by [Nasik], in New Hampshire, United States of America, in accordance with the Rules of the American Arbitration Association; and

2. if initiated by [Hubbard], in India, in accordance with the rules of the International Chamber of Commerce.

(1998 Agreement § XIX–A.) Questions going to the scope of arbitrability are governed by federal law. *See* 9 U.S.C. §§ 1 *et seq.* Where the arbitration clause is broad, as in this case, there is a presumption that the dispute in question is arbitrable, *see Mehler v. The Terminix Int'l Co.,* 205 F.3d 44, 49 (2d Cir.2000); *Oldroyd v. Elmira Sav. Bank,* 134 F.3d 72, 75 (2d Cir.1998); *cf. United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) (stating that an order to arbitrate "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an

interpretation that covers the asserted dispute"), and the Supreme Court has held that arbitration clauses of this nature encompass claims of fraudulent inducement or concealment, as well as other claims beyond pure breaches of contract, including RICO claims, unless the clause itself is alleged to have been procured by fraud. *See Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 519 n. 14, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974) (stating that a fraudulent inducement claim is no defense to a motion to dismiss based on a forum selection clause unless the fraud procured agreement to the clause specifically, rather than the agreement as a whole); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 406, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) (finding that arbitration clause covering "any controversy or claim arising our of or relating to this agreement" encompassed fraudulent inducement claim); *Shearson/Am. Express Inc. v. McMahon,* 482 U.S. 220, 223, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987) (stating that RICO claims are arbitrable under clause covering "any controversy arising out of or relating to ... this agreement or the breach thereof"); *Genesco v. T. Kakiuchi Ltd.,* 815 F.2d 840, 848, 855 (2d Cir.1987) (stating that phrase "relating to" in arbitration clause requires arbitration of fraudulent inducement claim and RICO claims); *see also Scherk,* 417 U.S. at 519–20, 94 S.Ct. 2449 (holding that controversies and claims "arising out of" a contract for the sale of a business brought securities violations related to the sale within the scope of arbitration clause); *Roby v. Corp. of Lloyd's,* 996 F.2d 1353, 1361 (2d Cir.1993) (same); *Bense v. Interstate Battery Sys. of Am.,* 683 F.2d 718, 720 (2d Cir.1982) (finding that a forum selection clause that applied to "causes of action arising directly or indirectly from [the agreement]" covered federal antitrust actions). Nasik contends that the Court may consider its fraud claims with respect to the 1998 Agreement because it "was entered pursuant to the Release." (Pl. Opp. Hubbard and Merial at 16; Pl. Opp. Indiv. Def. at 7.) This contention is unavailing. Although it is referenced in the Release, (Release ¶ 3), the 1998 Agreement was entered into pursuant to the parties' settlement, not the Release, and neither incorporates nor is incorporated in the Release. In addition, allowing claims under the 1998 Agreement to be brought pursuant to the Release's forum selection clause, as Nasik urges, would eviscerate the arbitration clause of the 1998 Agreement, which was clearly not intended by the parties. *Cf. Int'l Fidelity Ins. Co. v. County of Rockland,* 98 F.Supp.2d 400, 404 (S.D.N.Y.2000) (stating that courts must "safeguard against adopting an interpretation [of a contract] that would render any individual provision superfluous"); *Brinderson–Newberg Joint Venture v. Pacific Erectors,* 971 F.2d 272, 278–79 (9th Cir.1992) (rejecting interpretation that "violates a fundamental role of contract interpretation because it would render other portions of the contract meaningless").

Even if the Court were to consider the merits of Nasik's fraudulent inducement and concealment claims with respect to the 1998 Agreement, they would be dismissed for similar reasons as those set forth with regard to the Release. The court's discussion of the oral and written representations on which Nasik allegedly relied in entering into the Release is equally applicable here. *See supra.* Further, the terms of the 1998 Agreement indicate the implausibility of Nasik's reliance on statements indicating that the stock delivered by Hubbard ISA would be free and clear from disease. The warranty disclaimer, which has not been specifically challenged by Nasik, has already been discussed. Section XVI–C is also representative of

the limited assurances that Hubbard ISA made regarding the quality of the stock, as it provided that Hubbard ISA "shall deliver the Products in good condition to the extent ascertainable by [Hubbard ISA] at the time of delivery and recognizing that in the production of the Products there are certain factors which may affect the condition and value of such Products but which cannot be detected at the time of shipment." (1998 Agreement § XVI–C.) The section goes on to provide specific remedies to Nasik in the event the chicks delivered to Nasik do not live or grow, or become diseased.[16] (Id. §§ XVI–D, XVI–E.) Further, in Section XVI–K, Nasik acknowledged, as did defendants, that no warranties or representations other than those contained in the Agreement had been made to induce it to enter into the Agreement. (Id. § XVI–K.) Finally, the Agreement contains an integration clause, stating, in pertinent part, that

> [T]he Agreement ... constitutes the entire agreement between the parties relating to the supply and purchase of the Products and supersedes and extinguishes any prior drafts, agreements, undertakings, representation, warranties, and arrangements of any nature whether in writing or oral, relating to such supply and purchase ....

(Id. § XX–B.1.)

■ Because (i) defendants unequivocally disclaimed the fitness of stock to be delivered to Nasik, (ii) Nasik acknowledged that it had not relied on any representations external to the Agreement in entering into the Agreement, which would include a representation regarding the presence of disease in the stock, and (iii) Nasik agreed that the terms of the 1998 Agreement superseded any prior representations, the Court may decline to consider the evidence of defendants' alleged representations to Nasik during settlement discussions regarding the quality of stock to be provided. The New York Court of Appeals has held that where a party specifically disclaims reliance upon a particular representation in a contract, that party cannot, in a subsequent action for common law fraud, claim it was fraudulently induced to enter into the contract by the very representation it has disclaimed reliance upon. *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320–21, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959). A specific disclaimer typically consists of a clause, such as the one in the instant case, stipulating that the parties are not relying on extra-contractual representations. *Lucas v. Oxigene, Inc.*, No. 94 Civ. 1691, 1995 WL 520752, at *4 (S.D.N.Y. Aug. 31, 1995). The Second Circuit elaborated on this rule in *Harsco v. Segui*, 91 F.3d 337, 345–48 (2d Cir.1996), affirming the dismissal of fraud and negligent misrepresentation claims where a disclaimer provision and merger clause in a stock purchase agreement expressly stated that no representations other than those contained in the agreement were part of the transaction. The Court evaluated the disclaimer in light of: (i) the representations that were part of the transaction; (ii) the extended opportunity to confirm the disclosures in preliminary and confirmatory due diligence; (iii) the sophistication of the parties; and (iv) the arm's length nature of the transaction. *See id.* at 344.

Considering the analysis under *Harsco* in the context of this case, the Court finds that the record militates strongly against a finding of reasonable reliance, given the breadth and specificity of the disclaimer and the merger provision, the parties' spe-

---

**16.** Nasik disputes the validity of the limitation of damages provisions in Section XVI of the 1998 Agreement, but does not specifically contest the rationale for them.

cific exclusion of representations or warranties external to the Agreement, and the sophistication of the parties in what was clearly an arm's length transaction. There are few representations and warranties because of the breadth of the disclaimer, which makes due diligence regarding such representations less of a consideration. *See id.* at 345–48; *see also Lucas,* 1995 WL 520752, at *4–*5 (excluding parol evidence and dismissing fraud claim even in the absence of specific disclaimer, because three contractual provisions in the agreement, including a merger provision, acknowledged that neither party relied on representations other than those set forth in the contract).

### D. Negligent Misrepresentation

 Nasik asserts a claim for negligent misrepresentation arising out of Hacker's statement and the faxing of draft settlement agreements, and suggests that the settlement should be voided on such ground. (Pl. Opp. Merial and Hubbard at 13 n. 2.) To state a claim for negligent misrepresentation under New York law, "a plaintiff must establish that the 'defendant had a duty to use reasonable care to impart correct information because of some special relationship between the parties, that the information was incorrect or false, and that the plaintiff reasonably relied upon the information provided.'" *Jurgens v. Poling Transp. Corp.,* 113 F.Supp.2d 388, 397 (E.D.N.Y.2000) (quoting *Grammer v. Turits,* 271 A.D.2d 644, 706 N.Y.S.2d 453 (2d Dep't 2000)). A plaintiff may not recover for negligent misrepresentation in the absence of a "special relationship." Such relationship arises when the defendant possesses unique or specialized expertise, or is in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified. *Kimmell v. Schaefer,* 89 N.Y.2d 257, 263, 652 N.Y.S.2d 715,

675 N.E.2d 450 (1996); *Banque Arabe,* 57 F.3d at 158. Although the precise contours of this special relationship escape easy definition, courts have held that "the parties must enjoy a relationship of trust and reliance closer than that of the ordinary buyer and seller, and an arm's length business relationship is not enough to create that relationship." *Goodman Mfg. Co. L.P. v. Raytheon Co.,* No. 98 Civ. 2774, 1999 WL 681382, at *14 (S.D.N.Y. Aug.31, 1999) (citation and internal quotations omitted); *Dimon Inc. v. Folium, Inc.,* 48 F.Supp.2d 359, 373 (S.D.N.Y.1999). Moreover, such determinations are generally not susceptible to resolution at the pleadings stage. *Id.* (citing *Gruber v. Victor,* No. 95 Civ. 2285, 1996 WL 492991, at *18 (S.D.N.Y. Aug.28, 1996)). Given the arm's length commercial relationship between the parties in the instant case, it is likely that the type of relationship giving rise to a duty of care on the part of defendants is not present here. However, for the reasons explained in the previous section, the Court need not decide whether Nasik has properly alleged a special relationship, because it has failed to sufficiently allege reasonable reliance. Accordingly, with respect to defendants' conduct in the context of the parties' settlement, Nasik's negligent misrepresentation claim must be dismissed.

### E. RICO and Civil Conspiracy

In order to assert liability over all defendants for the acts of those discussed above, Nasik claims that defendants are liable under a RICO theory, as well as under the New York state law of civil conspiracy, although the latter is not, and need not be, denominated as a separate claim in the Amended Complaint. *See Brackett v. Griswold,* 112 N.Y. 454, 466–67, 20 N.E. 376 (1889) (noting that under New York law, "whenever it becomes necessary to

prove a conspiracy in order to connect the defendant with the fraud, no averment of the conspiracy need be made in the pleadings to entitle it to be proved"). Because Nasik broadly pleads its conspiracy claims to encompass the parties' conduct in entering into the Release and 1998 Agreement, (*see* Amend. Comp. ¶ 127; RICO Stmt. ¶¶ 2, 4, 5, 14, 16), the Court briefly addresses these claims here.[17]

In considering RICO claims, courts must attempt to achieve results "consistent with Congress's goal of protecting legitimate businesses from infiltration by organized crime." *United States v.. Porcelli*, 865 F.2d 1352, 1362 (2d Cir. 1989). "Because the 'mere assertion of a RICO claim ... has an almost inevitable stigmatizing effect on those named as defendants, ... courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.'" *Schmidt v. Fleet Bank*, 16 F.Supp.2d 340, 346 (S.D.N.Y. 1998). In ensuring that "RICO's severe penalties are limited to enterprises consisting of more than simple conspiracies to perpetrate the acts of racketeering ... courts must always be on the lookout for the putative RICO case that is really nothing more than an ordinary fraud case clothed in the Emperor's trendy garb." *Id.*

Nasik assert causes of action under RICO pursuant to 18 U.S.C. §§ 1962(c) and (d), as well as under a New Jersey statute, N.J.S.A. 2C:41–1 *et seq.* The moving defendants contend that each of the claims must be dismissed because Nasik has failed to (i) allege the predicate acts of mail and wire fraud with particularity under Rule 9(b), and (ii) identify an enterprise within the meaning of the statute. (Memorandum of Law in Support of De-

fendant Merck's Motion to Dismiss the Complaint ("Merck Mem.") at 14–17; Reply Memorandum of Law in Further Support in Further Support of Defendant Merck's Motion to Dismiss the Complaint ("Merck Rep.") at 11.) The Court agrees.

The courts of this Circuit have recognized that the policies behind Rule 9(b)'s particularity requirement apply with particular force in RICO actions. *See, e.g., Schmidt v. Fleet Bank*, No. 96 Civ. 5030, 1998 WL 47827, at *5 (S.D.N.Y. Feb.4, 1998) ("Rule 9(b)'s particularity requirements have 'even greater urgency' in civil RICO actions") (citation omitted). In addition to specifying the allegedly fraudulent statements, and the speaker, time, and place of such statements, plaintiffs asserting mail or wire fraud must also "identify the purpose of the mailing within the defendant's fraudulent scheme." *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172–73 (2d Cir.1999) (quoting *McLaughlin*, 962 F.2d at 191). Also, as with common law fraud, where multiple defendants are accused of mail or wire fraud, plaintiffs must plead fraud with particularity as to each defendant, *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir.1993); *Merrill Lynch, Pierce, Fenner & Smith v. Young*, No. 91 Civ. 2923, 1994 WL 88129, at *20 (S.D.N.Y. Mar.15, 1994).

Here, the Court finds that Nasik has failed to assert the predicate acts of mail and wire fraud with particularity with respect to the parties' settlement, because, as noted *supra*, these allegations are insufficient to state a claim for common law fraud. *See Merrill Lynch*, 1994 WL 88129, at *9–*11 (dismissing RICO mail and wire fraud claims against defendants where plaintiff had not successfully alleged

---

**17.** To the extent they treat the sufficiency of Nasik's allegations under the specific provisions of the federal RICO statute, the Court's findings are equally applicable to Nasik's RICO allegations more generally.

common law fraud against such defendants); *Morin v. Trupin*, 711 F.Supp. 97, 105 (S.D.N.Y.1989) ("Where [a] fraudulent scheme is premised upon inadequate pleading of common law fraud, the allegations of mail and wire fraud must also fall."). In addition, while Nasik states that defendants "caused numerous documents to be faxed to Nasik" in connection with the allegedly fraudulently induced settlement,[18] (Amend.Compl.¶ 131), the Amended Complaint and RICO Statement provide no indication of the purpose of the faxes in the fraudulent scheme itself, which is required under Rule 9(b). *See Odyssey Re (London) Ltd. v. Stirling Cook Brown Holdings Ltd.*, 85 F.Supp.2d 282, 301 (S.D.N.Y.2000) (finding that predicate wire fraud claims based on fax transmissions were insufficient because plaintiff "[did] not begin to 'identify the purpose of

the mailing within the fraudulent scheme'") (citation omitted). Accordingly, on the facts as alleged by Nasik, defendants' acts during the settlement discussions could not have been taken in furtherance of a fraudulent scheme in violation of the mail and wire fraud statutes, under either federal or New Jersey law.[19]

 Further, Nasik's allegations under the specific sections of the federal RICO statute, 18 U.S.C. §§ 1962(c) and (d), are insufficient to survive a motion to dismiss. Section 1962(c) prohibits "any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ..." 18 U.S.C. § 1962(c). Under this section, the RICO "person" must conduct the affairs of the

---

**18.** Specifically, Nasik alleges that (i) on May 25, 1998, its former counsel in New York received a fax from Merck in New Jersey containing a draft of the "Settlement Agreement"; (ii) on August 26, 1998, Hacker sent a fax from New Jersey to Nasik in India containing a draft of the 1998 Agreement; and (iii) on November 20, 1998, Merck sent a fax from New Jersey to Nasik in India informing them that copies of the 1998 Agreement had been sent by courier to Merial. (Amend. Compl. ¶ 131; RICO Stmt. ¶ 5.) Nasik only states, in conclusory fashion, that these faxes were "clearly connected to the plan of the Defendants to induce Nasik into settlement and shield all Defendants from liability." (RICO Stmt. ¶ 5.) Moreover, neither the three alleged letters and/or faxes in which alleged omissions by defendants were made, nor the USDA certificates, support Nasik's allegations of fraud. *See* Part III .C, *supra*.

**19.** Similar to its federal counterpart, the New Jersey RICO statute was created "to prevent, disrupt, and eliminate the infiltration of organized crime type activities which are substantial in nature into the legitimate trade or commerce of [New Jersey]." N.J.S.A. 2C:41–1.1; *State v. Ball*, 268 N.J.Super. 72, 632 A.2d 1222, 1239 (1993); *Metz v. United Counties Bancorp*, 61 F.Supp.2d 364, 371 (D.N.J.1999). New Jersey looks to decisions interpreting the

federal RICO statute when interpreting the state offense, unless inconsistent with *Ball. Maxim Sewerage Corp. v. Monmouth Ridings*, 273 N.J.Super. 84, 640 A.2d 1216, 1219 (1993). Thus, Nasik's failure to plead fraud with particularity is grounds for dismissal of the New Jersey RICO action. *Ideal Dairy Farms, Inc. v.. John Labatt Ltd.*, 90 F.3d 737, 747 (3d Cir.1996) (noting that fraudulent predicate acts are required under both New Jersey and federal RICO statutes). Moreover, the Amended Complaint does not allege that any actions amounting to fraud occurred in New Jersey, or that any injury occurred in New Jersey, which, given the underlying legislative purpose of the statute, also would appear to render the state RICO statute inapplicable. *See* N.J.S.A. 2C:41–1 .1 ("It is ... in the public interest to provide that activity which is inimical to the general health, welfare and prosperity of the State and its inhabitants be made subject to strict civil and criminal sanctions."); *In re Prudential Sec. Inc. Limited Partnerships Litig.*, 930 F.Supp. 68, 83 (S.D.N.Y.1996) (stating that application of the statute to alleged wrongful conduct occurring outside New Jersey involving plaintiffs who were not residents of New Jersey would violate due process).

enterprise, and "the person and the enterprise must be distinct." *Riverwoods Chappaqua Corp. v. Marine Midland Bank*, 30 F.3d 339, 344 (2d Cir.1994). The requirement that the person and enterprise be distinct leads to two conclusions. First, "the employees in association with [a] corporation do not form an enterprise distinct from the corporation." *Id.* Second, "a corporate entity may not be both [a] RICO person and the RICO enterprise under Section 1962(c)." *Id.*

 Here, Nasik first alleges that all of the defendants have created an "association in fact" which constitutes a RICO enterprise.[20] (Amend.Compl.¶ 138.) The RICO statute defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court has stated that a "group of individuals associated in fact" refers to "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981); *First Nationwide Bank v. Gelt Funding Corp.*, 820 F.Supp. 89, 98 (S.D.N.Y.1993) (stating that associated entities "must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes"). The touchstone of such a racketeering enterprise is "an ongoing organization, formal or informal" with "various associates function as a continuing unit." *Id.* Courts in the Second Circuit look to the "hierarchy, organization, and activities" of an alleged association-in-fact to determine whether its members func-

tioned as a unit. *United States v. Coonan*, 938 F.2d 1553, 1560–61 (2d Cir.1991).

 Nasik's allegations fall far short of such standard. As defendants point out, the Amended Complaint and RICO Statement reflect that Nasik has simply "strung together all of the defendants in this action and labeled the resulting group an association-in-fact enterprise." (Merck Rep. at 11; Amend. Compl. ¶ 138; RICO Stmt. ¶ 2.) Nasik states, in conclusory fashion, that "[D]efendants Hubbard, Merck, Merial LLC, Rhone Merieux, Preston, Gascoyne, Owen, Fyfe, Liberona, Shaw, Rector, [and] Baudon . . . combined in an association-in-fact . . . in that its members share a common purpose, unity and identifiable structure." Nasik's "conclusory naming of a string of entities does not adequately allege an enterprise." *Moy v. Terranova*, No. 87 Civ. 1578, 1999 WL 118773, at *5 (E.D.N.Y. Mar.2, 1999). Nasik has failed to present specific details of any hierarchy, organization, or unity among the various alleged conspirators. Nor do such allegations clearly differentiate between the "persons" and the "enterprise" as separate and distinct entities. *See Schmidt*, 16 F.Supp.2d at 350 (finding that association-in-fact enterprise was not adequately pled where plaintiffs failed to allege "any kind of chain of command or functional integration, as is typical of classic RICO enterprises," and merely alleged that the defendants participated in a scheme to defraud the plaintiffs); *First Nationwide Bank*, 820 F.Supp. at 98 (dismissing RICO claim where plaintiffs failed to allege "facts regarding the continuity of structure" of the alleged enterprise, and stating that "conclusory allegations that disparate parties were associated in fact

---

**20.** In its initial Complaint and its RICO Statement, Nasik asserted that Hubbard was the enterprise; Merck's motion to dismiss pointed out that this assertion was unavailing, given that a RICO "person" and the enterprise must be distinct. (Original Complaint ¶ 121; RICO Stmt. ¶¶ 6–13; Merck Mem. at 16.)

... are insufficient to sustain a RICO claim, absent allegations as to how the members were associated together in an 'enterprise'"); *Bernstein v. Misk*, 948 F.Supp. 228, 235 (S.D.N.Y.1997) (finding that plaintiff failed to describe an "organization whose various associates function as a continuing unit" or draw a distinction between persons and the enterprise).

Second, Nasik alleges that USDA is an enterprise. While USDA is distinct from the alleged RICO defendants, neither the Amended Complaint nor the RICO Statement specifically alleges, and no facts are alleged that would lead the Court to infer, that any of the defendants conducted the affairs of USDA, or in any way controlled such federal government agency. The Supreme Court has held that "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs [under Section 1962(c)], one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). Such is plainly not the case with USDA. While certain of the defendants, specifically Shaw and Rector, are alleged to have participated in the USDA's export certification process and made misleading representations to USDA concerning the health of the grandparent breeding stock sent to Nasik, there is no allegation, nor could one plausibly be made in good faith, that these doctors were involved in the operation or management of the agency. Nasik's claim that Shaw and Rector "participat[ed] in and controll[ed] the preparation and issuance of fraudulent USDA certificates," (Pl. Opp. Merck. at 14), is not reflected in the Amended Complaint, because it is contrary to the process of certification described therein. (Amend.Compl.¶¶ 51–55.) Even if the doctors' influence over the issuance of such certificates was substantial, USDA's pur-

portedly "ministerial" role nevertheless reflects its control over its own operations and management. (Pl. Opp. Merck. at 14; Amend. Compl. ¶ 55 (stating that USDA "review[s] the certification of the [outside] issuing veterinarian prior to endorsing it and makes it clear that the endorsing Veterinary Services veterinarian is relying upon the issuing veterinarian's certification")); *see also Eli Lilly & Co. v. Roussel Corp.*, 23 F.Supp.2d 460, 489–90 & n. 44 (D.N.J.1998) (finding that plaintiff's allegations that defendants obtained regulatory approval by submitting false documents to the Food and Drug Administration ("FDA") were not sufficient allegations of "operation and management" of the FDA within the meaning of *Reves* ). Accordingly, Nasik's claim under Section 1962(c) must be dismissed.

Because Nasik has not asserted facts sufficient to plead a claim under Section 1962(c), its claim under Section 1962(d) must also be dismissed. Section 1962(d) prohibits any person from conspiring to violate any of the substantive provisions of Sections 1962(a)-(c). Section 1962(d). To state a claim thereunder, a plaintiff must allege that "each defendant, by words or actions, manifested an agreement to commit two predicate acts in furtherance of the common purpose of a RICO enterprise," *Colony at Holbrook, Inc. v. Strata, Inc.*, 928 F.Supp. 1224, 1238 (E.D.N.Y.1996). An individual may be liable only if he knew of the conspiracy's goals and agreed to facilitate them. *Schmidt*, 16 F.Supp.2d at 353 (citation omitted). The Second Circuit has held that there can be no RICO conspiracy without a substantive RICO violation. In other words, "if the prior claims do not state a cause of action for substantive violations of RICO, then a RICO conspiracy claim necessarily does not set forth a conspiracy to commit such violations." *Id.*

(citing *Discon v. NYNEX Corp.,* 93 F.3d 1055, 1064 (2d Cir.1996)); *Katzman v. Victoria's Secret Catalogue,* 167 F.R.D. 649, 658 (S.D.N.Y.1996) ("[F]ailure to adequately plead facts that would satisfy the pleading requirements of 1962(a), 1962(b), or 1962(c) dooms any claim [plaintiff] might assert arising under 1962(d)."). Consequently, because Nasik has failed to assert a substantive RICO claim under Section 1962(c), its conspiracy claim under Section 1962(d) must likewise be dismissed.

▆▆▆▆ Alternatively, the Section 1962(d) claim must be dismissed because Nasik's pleadings fail to provide specific allegations supporting an inference that each defendant knowingly agreed to participate in a conspiracy. *See Odyssey,* 85 F.Supp.2d at 303 (stating that to state a Section 1962(d) claim, a plaintiff must allege "as to each alleged co-conspirator: (1) an agreement to join the conspiracy; (2) the acts of each co-conspirator in furtherance of the conspiracy; (3) that the co-conspirator knowingly participated in the same."); *Schmidt,* 16 F.Supp.2d at 354 ("Bare and conclusory allegations are insufficient to withstand a motion to dismiss and a plaintiff must plead facts sufficient to show that each defendant knowingly agreed to participate in the conspiracy.") Nasik alleges in conclusory fashion that defendants "embarked upon a conspiracy and racketeering enterprise . . . to distribute and sell worldwide diseased Hubbard Classic Breeding Stock for the purpose of continuing to reap profits from such sales" and that "each of the defendants associated in the enterprise adopted and implemented a scheme to defraud Nasik . . . by selling and continuing to sell Nasik . . . lines of chicken breeding stock which defendants knew was afflicted with [the cancer virus]." (Amend. Compl. ¶ 49; *see also* RICO Stmt. ¶ 14.) The individual defendants are each alleged to have authorized, directed, and/or supervised the fraudulent activities of "one or more of the other defendants." (RICO Stmt. ¶ 2.) While each defendant is alleged to have taken at least one act in support of the alleged fraud, neither the Amended Complaint nor the RICO Statement specifically alleges any agreement among the defendants to defraud Nasik, or how such acts supported a conspiracy. (Amend. Compl.¶¶ 49, 87–90, 100–102, 122–131.) The Court concludes that Nasik's allegations, devoid of factual assertions concerning the existence and nature of an agreement and unspecific as to the participants therein, are insufficient to state a claim under Section 1962(d). *See Allen v. New World Coffee, Inc.,* No. 00 Civ. 2610, 2001 WL 293683, at *9 (S.D.N.Y. Mar.27, 2001); *Schmidt,* 16 F.Supp.2d at 354; *NCA Holding Corp. v. Ernestus,* No. 97 Civ. 1372, 1998 WL 229510, at *3 (S.D.N.Y. May 7, 1998) ("General allegations that the defendants 'conspired' in the scheme do not sufficiently attribute responsibility for fraud to each individual defendant."); *Merrill Lynch,* 1994 WL 88129, at *31. The most that Nasik alleges is that each defendant had knowledge of a fraudulent scheme; but "mere knowledge of a scheme, even coupled, with personal benefit, is not enough to impose liability for a RICO conspiracy" *Congregacion de la Mision Provincia de Venezuela v. Curi,* 978 F.Supp. 435, 451 (E.D.N.Y.1997).

Nasik's claim of civil conspiracy under New York law, with regard to the parties' entry into their settlement arrangement, is equally flawed, because Nasik has failed to adequately allege either (i) fraud with particularity, or (ii) an agreement among the individuals purportedly involved in the fraudulent scheme. *See Brown v. Hutton Group,* 795 F.Supp. 1317, 1324 (S.D.N.Y. 1992) ("At a minimum, a claim for conspiracy to commit fraud requires: (i) an agreement between the conspirator and the

wrongdoer and (ii) a wrongful act committed in furtherance of the conspiracy."); *see also NCA Holding Corp.*, 1998 WL 229510, at *2–*3 (finding no civil conspiracy where plaintiff failed to adequately allege a common plan or fraud); *Scala v. Sequor Group*, No. 94 Civ. 0449, 1995 WL 225625, at *4, *9 (S.D.N.Y. Apr.14, 1995) (dismissing civil conspiracy claim with prejudice where plaintiff failed to sufficiently plead fraudulent inducement).

## IV. Pre–Release and Post–Settlement Claims

Because the Court has declined to find that the Release is void, each of Nasik's claims arising out of the 1994 Agreement are moot.[21] However, the Amended Complaint alleges several claims that also arguably encompass defendants' actions under the 1998 Agreement. These include claims (i) addressing the validity of certain terms contained in the 1998 Agreement, namely, the unconscionability of its limitation of damages provisions, (ii) for fraud and negligent misrepresentation, (iii) breach of contract and the implied covenant of good faith and fair dealing, (iv) tortious interference with contractual relations, and (v) violation of the NJCFA, N.J.S.A. §§ 56:8–

1 *et seq.*[22] For the reasons set forth in the Court's earlier discussion of the 1998 Agreement, *see* Part III.C.2 *supra*, these claims are subject to mandatory arbitration.

## V. Individual Defendants

Defendants Gascoyne, Owen, Baudon, Shaw and Rector, who are apparently the only individual defendants who have been served, move to dismiss Nasik's claims against them on various grounds. The Court grants these motions. The fraud, negligent misrepresentation, and RICO claims against each of these defendants arising out of the Release are insufficiently pled and must be dismissed for the reasons set forth above. *See* Part III, *supra*. The remainder of the claims against the individual defendants arise either out of the 1994 or 1998 Agreements. For those defendants who are party to the Release, the claims under the 1994 Agreement are barred by the plain terms of that agreement. This includes Gascoyne, Owen, and Baudon, because they are officers and/or employees of Merck, Hubbard ISA and/or Merial. (Release ¶ 4.) Nasik's claims against these officers and employees under the 1998 Agreement are subject

---

**21.** Even if the Release were invalid, the 1994 Agreement's arbitration clause would preclude this Court from considering such allegations. The arbitration clause, which parallels that of the 1998 Agreement, states in pertinent part that "[a]ny dispute, controversy or claim arising out of or relating to this Agreement, or the breach thereof ... shall be finally settled by arbitration." (1994 Agreement § XVII.) Moreover, for the reasons set forth in the Court's discussion of the 1998 Agreement, *see* Part III.C.2 *supra*, Nasik's claims are arbitrable.

**22.** A brief discussion of the NJCFA claim is nevertheless warranted. Because the Act only protects consumers who use economic goods, and in doing so, diminish or destroy their utility, the New Jersey courts have consistently concluded that purchasers of whole-

sale goods for resale—such as Nasik here—are not consumers within the meaning of the NJCFA. *See Lithuanian Commerce Corp. Ltd. v. Sara Lee Hosiery*, 179 F.R.D. 450, 470 (D.N.J.1998). Furthermore, this action, which involves an international transaction conducted between New Hampshire, North Carolina, and India, has no connection to New Jersey, aside from the fact that Merck and Preston are New Jersey citizens, and Merck communicated with other parties from New Jersey, and allegedly sent three faxes concerning the settlement to Nasik in India and to its former counsel in New York. The Amended Complaint does not allege that any of defendants' actions, or the parties' dealings, took place in New Jersey. Nasik's NJCFA claim, therefore, appears unavailing.

to arbitration, and therefore must be dismissed here. The courts of this Circuit have consistently held that employees and agents of an entity that is party to an agreement is protected by the arbitration clause within that agreement. *See, e.g., Roby,* 996 F.2d at 1360 (collecting cases); *D.C. Perry v. ICN Pharm.,* 866 F.Supp. 120, 121 (S.D.N.Y.1994).

■ That leaves Shaw and Rector, each of whom has moved, pursuant to Rule 12(b)(2), to dismiss the Amended Complaint against him for lack of personal jurisdiction. The Court grants their respective motions. First, contrary to Nasik's contention, these defendants did not either "expressly or impliedly agree[ ] to this venue for this action." (Amend. Compl.¶3.) Neither Shaw nor Rector are parties to the Release, and therefore are not subject to the New York forum selection clause contained therein. Second, the record does not reflect that either of these defendants "maintains offices, transacts business or [is] licensed to do business in this district." (*Id.*) In fact, Nasik does not allege, and the Court sees no reason to infer, that either Shaw or Rector has any contacts with New York whatsoever. Shaw is a veterinarian with a private practice in New Hampshire, and Rector is a veterinarian employed by the State of North Carolina; the Amended Complaint alleges only that they "issued" USDA certificates in their respective locales which Hubbard subsequently sent to India. (*Id.* ¶¶ 100–102.) Thus, neither Shaw nor Rector is subject to jurisdiction under the "doing business" prong of New York's jurisdictional analysis, or the "transaction of business" prong of New York's long-arm statute.[23] New York Civil Practice Law & Rules ("CPLR") §§ 301, 302(a).

Nasik claims that there is long-arm jurisdiction under CPLR § 302(a)(3),[24] because Shaw and Rector committed certain undefined tortious acts outside of New York which caused the fraudulent inducement to occur at settlement discussions which took place in New York. (Pl. Opp. Indiv. Def. at 8–9.) This contention is unavailing because (i) any injury Nasik suffered from the alleged inducement was suffered in India, not New York (*see* Amend. Compl. ¶¶ 50, 62, 97, 123–25), and (ii) in any event, there is nothing in the record to suggest that either defendant engages in any conduct in New York, derives revenue from goods used or services rendered here, or expected that their acts would have consequences in New York, as would be required for jurisdiction under Section 302(a)(3). Also unavailing is Nasik's assertion that Shaw and Rector "participated in the acts of the other defendants in New York." (Pl. Opp. Indiv. Def. at 9.) Such allegation is entirely conclusory and not reflected anywhere in the record.

23. Under CPLR § 301, New York courts may exercise personal jurisdiction over a foreign corporation that is "engaged in such a continuous and systematic course of 'doing business' in New York as to warrant a finding of its 'presence' in [the state]." *Jazini v. Nissan Motor Co.,* 148 F.3d 181, 184 (2d Cir.1998); CPLR § 301. New York's long-arm statute provides for jurisdiction where the defendant "transacts any business within the state or contracts anywhere to supply goods or services in the state." CPLR § 302(a)(1).

24. Under CPLR § 302(a)(3), the Court may take jurisdiction over a non-domiciliary defendant where he "commits a tortious act [outside] the state causing injury to person and property within the state ... if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." CPLR § 302(a)(3).

*Cf. Karabu Corp. v. Gitner,* 16 F.Supp.2d 319, 324 (S.D.N.Y.1998) ("Courts have … routinely granted 12(b)(2) motions for lack of personal jurisdiction where the plaintiff made only broad worded and vague allegations about a defendant's participation in the specific matter at hand."); *Sterling Interiors Group, Inc. v. Haworth, Inc.,* No. 94 Civ. 9216, 1996 WL 426379, at *15 (S.D.N.Y. July 30, 1996) (declining jurisdiction where plaintiff only made conclusory allegation that defendants "participated directly" in illegal scheme).

Moreover, asserting jurisdiction over either Shaw or Rector would offend due process, *see Int'l Shoe v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (stating that a court's exercise of long-arm jurisdiction must comport with due process), as neither has "purposefully avail[ed] [himself] of the privilege of conducting activities" in New York such that "[he] should reasonably anticipate being haled into court [here]." *Burger King v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Therefore, neither has the requisite "minimum contacts" in order for the maintenance of the claims against him not to "offend traditional notions of fair play and substantial justice." *Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. 154. Accordingly, the Court dismisses Nasik's claims against Shaw and Rector for lack of personal jurisdiction.

▆▆▆ For these reasons, the individual defendants' motions to dismiss are granted.[25]

## VI. Conclusion

▆▆▆ For the foregoing reasons, defendants' motions to dismiss are granted in full, and Nasik's Amended Complaint is dismissed. Construing the Amended Complaint liberally, the Court declines to grant Nasik leave to replead via a Second Amended Complaint. Whether to grant such leave lies within the Court's discretion, *see Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (stating that the Second Circuit Court of Appeals reviews the district court's dismissal of a complaint with prejudice for abuse of discretion), and "a court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated," *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991). Here, the Court finds that Nasik's submissions opposing the motions make clear that it does not have any other theory or allegations to put forward that might sustain its claims. Moreover, Nasik has already amended its Original Complaint in response to Merck's motion to dismiss, and previously asserted the same facts and many of the same claims in the Draft Complaint. Accordingly, the Court dismisses Nasik's claims with prejudice.[26] *See DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 71–72 (2d Cir.) *cert. denied,* 519 U.S. 1007, 117 S.Ct. 509, 136 L.Ed.2d 399 (1996) (stating that it is not an abuse of discretion to dismiss a complaint without leave to replead "when a party has been given ample prior opportunity to al-

---

**25.** The Court declines to permit Nasik to conduct discovery "to see if there is other basis [sic] for jurisdiction." (Pl. Opp. Indiv. Def. at 10.) Where, as here, a plaintiff fails to make the prima facie jurisdictional showing to defeat a motion to dismiss, the plaintiff is not entitled to discovery. *See Jazini,* 148 F.3d at 184; *Stewart v. Vista Point Verlag & Ringier*

*Publ'g,* No. 99 Civ. 4225, 2000 WL 1459839, at *6 (S.D.N.Y. Sept.29, 2000).

**26.** The Court's decision here only precludes Nasik from further prosecuting its claims in federal court. As noted *supra,* each of its claims arising out of the 1998 Agreement are subject to arbitration according to the Agreement's terms.

lege a claim"); *see also Solar v. Nachtomi,* No. 00 Civ. 3564, 2001 WL 641151, at \*11 (S.D.N.Y. Jun.8, 2001) (dismissing complaint, which, *inter alia,* alleged fraud, with prejudice where plaintiff had amended complaint once in response to motion to dismiss and had pled some of the same claims in a parallel action); *cf. Armstrong v. McAlpin,* 699 F.2d 79, 93–93 (2d Cir. 1983) ("Because the complaint whose allegations were being considered by the district court was plaintiff's second amended complaint, the district court did not abuse its discretion in refusing to give plaintiffs a fourth attempt to plead."). The Clerk of the Court is directed to close the file in this Action.

SO ORDERED.